UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EDSON SILVA, | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | CIVIL ACTION # |
| | ) | |
| STEVEN W. TOMPKINS, Sheriff | ) | |
| Respondent | ) | |

**MEMORANDUM IN SUPPORT OF PETITION FOR RELIEF
PURSUANT TO 28 U.S.C. § 2254**

## INTRODUCTION

Now comes Edson Silva and respectfully files this petition for a writ of habeas

corpus challenging his convictions related to the alleged unlawful possession of one

firearm.  Silva also challenges the denial of the direct appeal of his convictions in the

Massachusetts state appellate courts.  The Massachusetts Appeals Court affirmed Silva's

convictions and the Massachusetts Supreme Judicial Court denied Silva's application for

further appellate review.  Silva has fully exhausted his state court remedies for the federal

constitutional claims that he raises herein.

Because there were egregious federal constitutional errors and decisions in the state

court proceedings that were both contrary to - and an unreasonable application of - clearly

established precedent from the United States Supreme Court, Silva respectfully requests

that this Court vacate his convictions and grant him a new trial.

## SUBJECT MATTER JURISDICTION

28 U.S.C. § 2254 gives federal courts jurisdiction to entertain habeas corpus

petitions from individuals who are "in custody" pursuant to a state court judgment. 28

U.S.C. § 2254(a).  The meaning of custody is liberally construed for purposes of habeas

corpus.   See <u>Maleng v. Cook</u>, 490 U.S. 488, 490-492 (1989).  The custody provision does

not require physical incarceration, and a petitioner is in custody if he is on parole, on

probation, or serving a suspended sentence.  <u>Tinder v. Paula, SND</u>, 725 F.2d  801 (1st Cir.

1984)(parolee, probationer, and suspended sentence in custody); <u>Jones v.</u>

<u>Cunningham</u>, 371 U.S. 236, 241-43 (1963) (parolee is in custody); <u>Helm v. Jago</u>, 588 F.2d

1180, 1181 (6th Cir.1979) (probationer is in custody); <u>United States v. Hopkins</u>, 517 F.2d

420, 423-24 (3d Cir.1975) (person serving suspended sentence is in custody).

       In this case, Silva was convicted in Massachusetts state court and sentenced to a

custodial punishment, including a period of incarceration in jail followed by a suspended

sentence and a period of probation. Silva is presently still in custody as he is still on

probation based on the challenged convictions.  Silva is also a non-citizen facing

deportation in connection to the challenged convictions and those serious immigration

consequences will continue even after Silva is no longer in custody.  <u>Leitano v. Reno</u>, 311

F.3d 453 (1st Cir. 2002).  Additionally, Silva raises federal constitutional questions

challenging the legality of the convictions and sentences on the grounds that they were

imposed in violation of the Constitution of the United States of America.

       For these reasons, this Court has subject matter jurisdiction over Silva's petition for

habeas relief.  See <u>Garlotte v. Fordice</u>, 515 U.S. 39 (1995); <u>Maleng v. Cook</u>, 490 U.S. 488,

492 (1989); <u>Jean v. Nelson</u>, 472 U.S. 846, 849 (1985); <u>Nelson v. George</u>, 399 U.S. 224

(1970); <u>Jones v. Cunningham</u>, 371 U.S. 236 (1963); <u>Leitano v. Reno</u>, 311 F.3d 453 (1st Cir.

2002); <u>Tinder v. Paula, SND</u>, 725 F.2d  801 (1st Cir. 1984); <u>Picrin-Peron v. Rison</u>, 930

F.2d 773, 775 (9th Cir. 1991); <u>Frank v. United States</u>, 914 F.2d 828, 829 (7th Cir. 1990);

<u>Dawson v. Scott</u>, 50 F.3d 884, 886 n.2 (11th Cir. 1995); <u>McVeigh v. Smith</u>, 872 F.2d 725,

727 (6th Cir. 1989)(stay of probation).

**PRIOR PROCEEDINGS**

Edson Silva was charged in the Boston Municipal Court with unlawful possession of a firearm in violation of M.G.L. c. 269, §10(a), unlawful possession of a loaded firearm in violation of M.G.L. c. 269, §10(n), possession of ammunition without an FID card in violation of M.G.L. c. 269, §10(h) and defacing a serial number in violation of M.G.L. c. 269, §11C on docket # 1002-CR-003581.

Because the police seized and searched Silva without a warrant while he was lawfully walking down a public street, Silva filed a Motion to Suppress and the motion was heard by Justice Forde in the Boston Municipal Court Central Division on December 21, 2009.  The motion to suppress was denied on January 28, 2010.  A jury trial was also held before the same Justice Forde on September 22, 2010.   After a two-day trial, Silva was convicted on all counts. On September 23, 2010, the trial judge sentenced Silva to two years in the House of Corrections on count one, two years in the House of Corrections on count two, with one year to be served from and after count one and the balance suspended for two years, and on counts three and four two years concurrent with count one.  Silva filed a timely notice of appeal.

On January 18, 2013, Silva filed a direct appeal of his convictions with the Massachusetts Appeals Court.   On December 18, 2013, the Massachusetts Appeals Court issued an unpublished decision on Silva's direct appeal.  Commonwealth v. Edson Silva, 84 Mass. App. Ct. 1125; 999 N.E.2d 503; 2013 Mass. App. Unpub. LEXIS 1207 (2013). The Appeals Court ruled that the conviction for unlawful possession of ammunition was reversed and that the remaining convictions were affirmed.  Id.

Silva then filed an Application For Further Appellate Review with the Massachusetts Supreme Judicial Court on January 9, 2014 seeking further review of his

convictions and his federal constitutional claims.  However, on February 28, 2014, the

Supreme Judicial Court denied Silva's application.  Silva did not seek certiorari to the

United States Supreme Court, and the ninety-day time period in which he could seek

certiorari before filing a habeas petition expired on May 29, 2014.  Silva now timely files

this habeas petition within one year of that date.

## STATEMENT OF FACTS

This case involved the all-too-common scenario where Boston Police officers stop

a young man with black skin and without any reasonable justification.  Here, police

officers stopped Silva when he and a companion were lawfully walking down a public

street.  After the stop did not turn up any evidence, the police decided to continue the

detention and to search the ground on the public street for any evidence that they might be

able to use to charge Silva with a crime.  Police eventually found a gun underneath a car

that did not belong to Silva.  Police later admitted that they never saw Silva possess that

gun and that Silva's fingerprints were not on the gun, but a police officer claimed that he

may have seen Silva bend down near that car while walking.  With that circumstantial

speculation, and aided by inadequate jury instructions and serious federal constitutional

errors by the trial judge, the prosecutor erroneously albeit successfully argued that the jury

should convict Silva.

### Silva's Pre-Trial Motions

Prior to trial, the Court denied Silva's motion requesting that the trial judge recuse

herself, which he requested because the judge had made adverse findings and credibility

findings on Silva's Motion to Suppress, including her decision to credit the police officer and her belief that Silva possessed a gun. (I-6)[1].

Trial counsel for Silva requested individual voir dire of the potential jurors. (I-8). However, the trial judge denied the request for individual voir dire of potential jurors, claiming that she did not have the "time or the resources" to conduct individual voir dire. (I-8).

Silva filed a pretrial Motion in Limine to exclude Officer McCormack's speculative opinion that Silva's action of bending down was consistent with a black male placing contraband or a weapon on the ground. (I-10). The Court allowed Silva's motion to exclude such testimony and indicated that such testimony would be improper and the Commonwealth agreed not to elicit any questions about this issue. (I-10).   However, as discussed later herein, the prosecutor did not abide by the judge's ruling (she elicited the excluded testimony from the officer) and the judge did nothing to correct the error.

### The Trial

#### The Prosecutor's Opening Statement

Silva objected to the prosecutor's opening statement, which claimed that Silva placed the gun in the snow ten minutes before it was found, despite that the Commonwealth had no evidence to support any such claim. (I-70).  The trial judge denied Silva's motion for a mistrial or in the alternative for curative instructions to the jury. (I-70).

#### The Prosecutor's Case

Officer Richard McCormack, testified that he worked for the Boston Police Department for 17 years. (I-76).  On January 17, 2009, Officer McCormack was with his

---

[1] Citations to Silva's trial transcripts are listed as: (Volume # - page #).

partner Michael Condon in a marked cruiser at 2:15 AM on routine patrol in the Uphams

Corner section of Boston, which he claimed was a high crime area. (I-79).

As Officer McCormack took a left on Harrow Street he claimed he saw two

individuals walking in the middle of the street. (I-82).  There was nothing specific about

these two men that caused Officer McCormack any concern. (I-82).  They were not

walking or talking in a manner that was in any way suspicious. (I-82).  Officer

McCormack noticed that one of the two individuals left the middle of the street and began

walking on the sidewalk. (I-83).  Officer McCormack claimed that he saw the individual

who went to the sidewalk bent over behind a car, extended his arm, then stood back up and

continued to walk toward Officer McCormack and his partner. (I-85). Officer McCormack

did not see anything in this person's hands before he bent down. (I-93).

Officer McCormack identified Silva as the individual who bent over.  (I-88).

Officer McCormack stopped his vehicle, went to the sidewalk, and "announced his

presence." (I-88).  Silva did not attempt to walk in the opposite direction nor did he

attempt to run. (I-136). "When we asked him to stop, he stopped." (I-150).  Silva was not

free to go. (I-167, 169). Officer McCormack and his partner brought both individuals to the

sidewalk and requested back up. (I-90).  Officer McCormack asked Silva if he could speak

to him and described Silva as "very calm." (I-89).  Officer McCormack did not recall

asking Silva for identification. (I-151).

Once additional units arrived, Officer McCormack walked back to the vehicle Silva

bent down beside because "it looked like he was placing something, so I walked…" (I-90).

Silva objected and moved for a mistrial because the trial judge had allowed his Motion in

Limine to exclude such a speculative opinion on the ultimate issue, such that no witness

could testify that Silva placed something next to the car, as that was the ultimate issue in

the case and should be left for the jury to determine. (I-91).  The prosecutor erroneously told the judge that Officer McCormack did not say, "it looked like he placed something." (I-91).  The judge denied Silva's Motion for a Mistrial based on this trial ambush of excluded evidence and instructed Officer McCormack to keep his conclusions to himself. (I-91).  Silva again objected that the jurors were not told to disregard Officer McCormack's speculative testimony.  Silva requested a specific instruction that the jury should disregard any testimony that Silva attempted to place anything on the ground. (I-92).  Instead, the judge told the jury simply to disregard any "conclusions." (I-92).

Officer McCormack told the jury he found a gun at the rear of the vehicle. (I-93). Officer McCormack told the jury that he had met Silva before and that he asked him the "regular" questions and told the jury that Silva knew what an FIO form was. (I-151).  Silva objected and moved to strike. (I-151).   The Court struck Officer McCormack's answer and instructed the jury to disregard it. (I-151).

Right after that error, Officer McCormack again told the jury, "I say I asked him for identification because that's what I normally do, but I knew the gentleman." (I-152). Silva objected and again moved to strike. (I-152).  The Court again struck Officer McCormack's answer and instructed the jury to disregard it. (I-152).

No fingerprints matching Silva were found on the gun. (I-122).  No one from the Boston Police requested the assistance of a thermal imaging unit to determine if the gun was recently held by someone. (I-123).

Officer McCormack claimed that the details of the night were clear in his mind, but he identified the wrong car that he claimed the gun was found beside. (I-153, 177)(Identifies vehicle in Exhibit 15).  As defense counsel attempted to impeach Officer McCormack with photographs of the scene turned over in discovery, defense counsel

7

showed the photos to the prosecutor, placed them before Officer McCormack and moved

to introduce the photographs for the first time when the prosecutor informed defense

counsel that the photographs provided to the defense were from another case. (I-101).  The

prosecutor admitted she knew the photographs were from another case and did not tell

defense counsel. (I-105-106). The trial judge chastised the prosecutor for this ambush

tactic, indicating that there was no way for defense counsel to know that the photographs

were unrelated unless the prosecutor told her, but did not declare a mistrial. (I-106-7).

Officer McCormack told the jury that the car that the gun was found next to

belonged to a resident of 20 Harrow Street. (I-121). No one asked any of the occupants of

Harrow Street about the firearm on the ground. (I-121).  In fact, Officer McCormack did

not know how many apartments were located at 20 Harrow Street. (I-121).

OFFICER RICHARD MCNEILL, of the Boston Police Department testified that he

was assigned to area B-2 on January 17, 2009 when he responded to the scene and saw

Officer McCormack and Condon had two gentlemen stopped. (I-182).  Over Silva's

objection, the Court allowed Officer McNeill to tell the jury that Officer McCormack told

him that he found a firearm. (I-88).  Officer McNeill told the jury he Mirandized Silva. (I-

188).

**The Judge Prevents Silva From Presenting Exculpatory Evidence**

OFFICER TIMOTHY HANCOCK, worked for Boston Police for 16 years. (I-196).

He was working on January 17, 2009 with his partner Richie McNeil in plain clothes when

he responded to Harrow Street. (I-197-8).  Officer Hancock secured the scene and searched

for evidence. (I-199).  The Court allowed Officer Hancock to testify over Silva's objection

that a firearm was found at the scene. (I-199).  A firearm with an evidence tag was

admitted into evidence over Silva's objection. (I-202). Officer Hancock testified that by

8

the time he got to the scene, the firearm was already in the box on top of the police car. (I-205).

Officer Hancock reviewed the CAD (Computer Assisted Dispatch) records for the night in question and told the jury that the CAD keeps track of when an officer arrived on scene. (I-208).

The Commonwealth's entire case against Silva rested on the testimony of Officer McCormack who testified that a firearm was recovered in a specific location under the same vehicle Silva bent down next to. (I-95). Officer Hancock, who responded to the scene after Silva was arrested, testified that the firearm was in a box on the hood of a police cruiser when he arrived. However, according to the Computer Assisted Dispatch ("CAD") sheet, the officer who responded to the scene to take photographs did not arrive until after Officer Hancock arrived. (Trial Exhibit A).

Silva attempted to impeach Officer Hancock and introduce the exculpatory CAD sheet to demonstrate that the person who took the photos arrived after Officer Hancock, and that the photos could not have been taken before Officer Hancock arrived unless someone moved the gun prior to taking the photographs. (I-210).  This exculpatory evidence suggesting that the gun was moved was part of Silva's defense – that the Commonwealth could not prove beyond a reasonable doubt that he possessed the firearm, where he was not seen possessing the firearm and the police did not actually see him drop it.  Despite that the CAD evidence went to the heart of Silva's defense, the trial judge prevented Silva from presenting this defense.  (I-223).   The trial judge prohibited Silva from impeaching Office Hancock with the CAD sheet (which would have shown that the gun was moved by police) and instructed the jury to ignore Silva's theory of defense.  (I-223).  Specifically, the Court told the jury to "disregard all of this," stating, "When I say

9

you disregard this, you disregard this." (I-223).  As such, the jury was prevented from hearing Silva's defense.

### Further Police Testimony

OFFICER MYRON PHILLIPS, identified Silva as someone he booked on January 17, 2009. (I-227).  Officer Phillips testified over Silva's objection that after he told Silva of the charges against him, Silva said, "How you going to charge me with possession.  You didn't see me throw it." (I-233).  Officer Phillips claimed that prior to making this statement he read Silva his Miranda rights from a card. (I-235).

Officer Phillips had previously claimed that he had read Silva his Miranda rights from a poster on the wall of the booking area. (I-235). Officer Phillips did not recall if Silva understood his rights or made any statements indicating he understood his rights. (I-244).

### Forensic Testimony

DETECTIVE MARTIN LYDON, testified that he worked for Boston Police for 23 years and in the Firearms Analysis Unit for 11 years and examined over 2000 guns. (I-246,249).  Detective Lydon examined the gun in this case and in his opinion it was a working firearm. (I-255).

KEVIN KOSIOREK, a chemist with the Boston Police for eleven years, testified over Silva's objection that it is possible for a person to touch a surface and not leave his or her fingerprints. (II-11).  Mr. Kosiorek further testified - over Silva's objection and absent any supporting evidence - that there could have been additional fingerprints on the alleged firearm and that any fingerprints may have been wiped off. (II-11).  Mr. Kosiorek recovered one fingerprint on the gun. (II-16).

RACHAEL LEMERY, testified over Silva's standing objection to each question, that she was a senior criminalist for the Boston Police. (II-18).  She followed the ACE-V method of identifying fingerprints. (II-18).  She did not actually examine the fingerprint on the gun in this case, but instead reviewed the digital images of the latent print recovered by someone else. (II-28).  She determined that there was insufficient ridge detail to make any comparisons. (II-29).   As such, Edson Silva's fingerprints were not found on the gun that was found on the public street and that no one ever saw him possess.  (II-29).

Ms. Lemery testified over Silva's objection that someone else looked at the same fingerprint and came to the same conclusion. (II-30). Ms. Lemery did not do the initial comparison, but was the reviewer in this case and was essentially a substitute witness. (II-30).

**The Judge Again Denies Silva's Trial Requests To Present A Defense**

After the Commonwealth rested, Silva moved for a required finding of Not Guilty. (II-31-32).  The trial judge denied this motion. (II-34).  After the required finding of not guilty, defense counsel requested that the Court issue process for the Boston Police because they would not respond to her subpoena for the keeper of the records for the CAD sheets.[2] (II-41). The CAD evidence and testimony was relevant to Silva's defense and to rebut the police testimony.  (II-41).  By refusing to respond to a valid subpoena, the Boston Police prevented Silva an opportunity to present a viable defense with a made up rule. (II-43).

---

[2] Trial counsel notified the Court that she attempted to serve Boston Police with a subpoena the previous night and the Boston Police claimed that they did not accept subpoenas after 5:00PM. (II-6).

Despite that a subpoena was necessary to Silva's defense, the trial judge refused to issue a capias for the Boston Police "because it would be futile in any case." (II-44). Silva moved for a continuance to secure the witness from Boston Police, indicating that the witness was vital to Silva's defense. (II-45).  The trial judge denied the request, stating "we have to keep going and we now have jury instructions that have been requested." (II-45).

**Silva's Case (Without The Exculpatory Evidence Excluded By The Judge)**

<u>CLIFFORD GOODBAND,</u> a senior intelligence analyst for the Boston Police, was called by Silva to testify that he creates maps to monitor trends and patterns of crimes within the city of Boston. (II-59).  He made a map of the crimes reported within a one mile radius of 20 Harrow Street six months prior to his incident. (II-60).  The map was entered as an exhibit and displayed 3 homicides, 53 fatal shootings, and 62 firearms arrests in the same area where the gun was found on the street under someone else's car. (II-63).

The trial judge ruled that she would not allow Silva to call any witness to provide any more details as to the area of 20 Harrow Street where the gun was located. (II-64).

**The Prosecutor's Burden-Shifting Closing Argument**

During her closing argument, the prosecutor told the jury that Silva's defense case was a "junk drawer" and repeatedly referred to the defense case as a distraction. (II-74-78). The prosecutor told the jury that defense counsel's cross-examination on the photographs, what the defendant was wearing, about how many firearm arrests were in the area, the lack of prints on the car and the lighting conditions were distractions. (II-76-78).  The prosecutor also suggested that Silva's prints were on the gun absent any evidence that Silva's prints were on the gun. (II-78).

Silva objected to the Commonwealth's closing and requested an instruction to cure the above errors and the Court responded, "Thank you both very much for your objections, and they're on the record." (II-79).

### The Jury Charge Conference

Silva requested a jury instruction on the police failing to record statements pursuant to Commonwealth v. DiGiambattista and the Court indicated it would not give the instruction because "there was no testimony concerning any recordings in this case." (II-54).  The trial judge appeared to misunderstand the law regarding that requested instruction.  Defense counsel explained that the failure to record Silva's alleged statement is the basis for the instruction. (II-55). The Court denied the request. (II-55). Silva renewed his motion for a required finding at the close of all the evidence. (II-53).

### Silva's Objections To Unconstitutional Jury Instructions

The trial judge refused to give the standard reasonable doubt instruction. The complete instruction given was stated as follows:

> Now, we keep using the term reasonable doubt.  What is proof beyond a reasonable doubt?  Proof beyond a reasonable doubt does not mean proof beyond all possible or imaginary or whimsical doubt or proof beyond all possibility of innocence.  A reasonable doubt does not mean the kind of doubt that can be conjured up by someone who is seeking for doubt or for an excuse to acquit a defendant.  Instead a reasonable doubt means such a doubt as remains in the mind of a reasonable person who is earnestly seeking the truth.  The Commonwealth is not required to prove the defendant's guilt to an absolute or mathematical certainty, the kind of certainty that you have when you add two and two and you get four.  But the Commonwealth is required to prove more than a probability.  They're required to prove the defendant's guilt to a moral certainty, the kind of certainty that satisfies your judgment and your consciences as reasonable men and women and leave in your mind a clear and settled conviction that the defendant is guilty.

(II-87).

Silva objected to the jury instructions given by the trial judge and requested that the Court give the instructions submitted by Silva. (II-95).  In addition, Silva objected to the

jury instructions because the Court did not give a standard instruction on reasonable doubt and objected to the Court's language in defining reasonable doubt at "seeking an excuse to acquit the defendant." Defense counsel argued that the instruction by the Court was highly prejudicial and did not explain what reasonable doubt was. (II-92).

Silva also objected to the lack of instruction on inferences, the prohibition against conjecture, the lack of any instruction on the defendant's decision not to testify, the failure to give a complete <u>Bowden</u> instruction. (II-95).

Silva also objected to the instruction on the crime relating to a defaced serial number. (II-95). The judge told the jury that the charge of removing a serial number from a firearm was "basically self-explanatory" and thus required no jury instruction. (II-90).

### The Verdict

After the judge had prevented Silva from presenting exculpatory evidence as part of a complete defense, and after the judge gave her instructions to the jury on the law over Silva's objections, the jury found Silva guilty on all counts.

## STANDARD OF REVIEW

### 1.  STANDARD FOR GRANTING HABEAS PETITIONS

When a state appellate court fails to adjudicate the merits of a federal constitutional claim that was presented by a petitioner in state court, this Court reviews the issue de novo and is empowered to grant relief without any deference to the decision of the state appellate court. <u>White v. Woodall</u>, 134 S. Ct. 1697 (2014); <u>Johnson v. Williams</u>, 133 S. Ct. 1088, 1097 (2013); <u>Harrington v. Richter</u>, 562 U.S. __, 131 S.Ct. 770 (2011); <u>Clements v. Clarke</u>, 592 F.3d 45, 52 (1st Cir. 2010).

Even when a claim was adjudicated on the merits in state court, 28 U.S.C. § 2254(d) empowers this Court to grant a petition for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a state court with respect to any claim that was

adjudicated on the merits in state court proceedings if the adjudication of the claim:

  (1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme
Court of the United States; or

  (2) resulted in a decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the State court proceeding.

See 28 U.S.C. § 2254(d).  See also The Antiterrorism and Effective Death Penalty Act of

1996 (AEDPA); White v. Woodall, 134 S. Ct. 1697 (2014).

     The U.S. Supreme Court has held that "[u]nder the 'contrary to' clause [of §

2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a

conclusion opposite to that reached by the Supreme Court on a question of law or if the

state court decides a case differently than this Court has on a set of materially

indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). As to what is

clearly established federal law, the reviewing court looks to past holdings of the United

States Supreme Court.  White v. Woodall, 134 S. Ct. 1697 (2014)(clearly established law

includes the holdings but not the dicta of prior United States Supreme Court decisions).

     "Under the 'unreasonable application' clause, a federal habeas court may grant the

writ if the state court identifies the correct governing legal principle from this Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case."

Williams, 529 U.S. at 413.  This has been interpreted as asking whether the state court's

derivation of a case-specific rule from the U.S. Supreme Court's generally relevant

jurisprudence appears objectively reasonable. White v. Woodall, 134 S. Ct. 1697 (2014)(;

O'Laughlin v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009); Hurtado v. Tucker, 245 F.3d 7,

16 (1st Cir. 2001).

A state-court decision is an unreasonable application of clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case.  See White v. Woodall, 134 S. Ct. 1697 (2014); Cullen v. Pinholster, 563 U. S. ___, 131 S.Ct. 1388  (2011); Rompilla v. Beard, 545 U. S. 374, 380 (2005).  A state court decision also "may be unreasonable if it is devoid of record support for its conclusions or is arbitrary." McCambridge v. Hall, 303 F.3d 24, 36-37 (1st Cir. 2002). "The increment [of the state court's incorrectness] need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." Morgan v. Dickhaut, 677 F.3d 39, 46-47 (1st Cir. 2012).  See also Harrington v. Richter, 131 S.Ct. 770 (2011).

2. **THE STATE COURT'S DECISION DENYING SILVA'S APPEAL SHOULD BE REVIEWED DE NOVO BECAUSE THERE WAS NO FAIR ADJUDICATION ON THE MERITS OF SILVA'S FEDERAL CONSTITUTIONAL CLAIMS**

Because the Massachusetts appellate courts did not adjudicate the merits of Silva's federal constitutional claims, this Court should review the claims de novo.  See White v. Woodall, 134 S. Ct. 1697 (2014); Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013); Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).

The language of 28 U. S. C. § 2254(d) makes it clear that deference to a state court decision applies only when a federal claim was "adjudicated on the merits in State court." Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013).  This of course begs the question of what exactly is meant by adjudication on the merits.  In this regard, the United States Supreme Court has issued relevant decisions.

The U.S. Supreme Court has held that when a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits. Harrington v. Richter, 562 U. S. ___, 131 S.Ct. 770 (2011)("[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

More recently, the U.S. Supreme Court also held that when the state court addresses some of the claims raised by a defendant but fails to specifically address a claim that is later raised in a federal habeas proceeding, the habeas court should again presume (subject to rebuttal) that the federal claim was adjudicated on the merits. Johnson v. Williams, 133 S. Ct. 1088, 1091 (2013).

However, a judgment is rendered "on the merits" only if it was "delivered after the court . . . heard and evaluated the evidence and the parties' substantive arguments." Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013), citing and quoting Black's Law Dictionary 1199 (9th ed. 2009) (emphasis added).  In this regard, if a federal claim is rejected by a state appellate court as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter.  See Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013).  In such a scenario, the habeas court should not afford any deference to the state appellate court decision.  See id.

Likewise, if there is any indication that the state court analyzed a claimed error without analyzing the federal constitutional component of the claimed error, the federal claim was not adjudicated on the merits and no deference is due. See Harrington v.

Richter, 562 U. S. ___, 131 S.Ct. 770 (2011).  Further, the presumption of merits analysis "may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 785.

If the state appellate court relied solely on state standards that did not implicate federal constitutional issues, the habeas court should review the matter de novo. See Clements v. Clarke, 592 F.3d 45 (1st Cir. 2010); DiBenedetto v. Hall, 272 F.3d 1, 6-7 (1st Cir. 2001).  This does not mean that the state court appellate decision must always cite to federal cases, but it does mean that the appellate decision must actually address and resolve the federal issue.  Clements v. Clarke, 592 F.3d 45 (1st Cir. 2010).

Thus, in Clements the First Circuit held that although the state court decision cited only to a state case, the federal issue was adjudicated on the merits because the cited state case clearly dealt with the federal constitutional issue.  See Clements v. Clarke, 592 F.3d at 54. See also Hodge v. Mendonsa, 739 F.3d 34, 41 (1st Cir. 2013)(Massachusetts Appeals Court citation to a state case that specifically involved the federal due process issue, along with articulation of reasons why federal claim would fail, was an adjudication on the merits).

Contrarily, the First Circuit held in another case that the petitioner's federal claim was not adjudicated on the merits because the state court cited only Massachusetts judicial decisions that did not address the federal constitutional issues raised by the petitioner. DiBenedetto v. Hall, 272 F.3d 1, 7 (1st Cir. 2001)(reviewing claims de novo because state court did not actually decide the "constitutional claims raised by the defendant.").  See also Norde v. Keane,294 F.3d 401, 410 (2d Cir. 2002) (reviewing state court opinion that, although addressing evidentiary challenges, "did not mention Norde's Sixth Amendment claims").

When the state's highest appellate court declines further review, the habeas court should look to the language of the lower appellate court decision to determine whether a federal constitutional claim was adjudicated on the merits.  Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).  A "state court decision that does not address the federal claim on the merits falls beyond the ambit of AEDPA." Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010). The habeas court reviews federal claims raised but unadjudicated in state court de novo. Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010); Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007); Lynch v. Ficco, 438 F.3d 35, 44 (1st Cir. 2006).  As the First Circuit has reasoned, a habeas court "can hardly defer to the state court on an issue that the state court did not address." Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001).

In this case, the Massachusetts Supreme Judicial Court denied further appellate review of Silva's federal constitutional claims.  Therefore, this Court must look the decision of the Massachusetts Appeals Court to determine whether Silva's federal constitutional claims were adjudicated on the merits.

Here, although Silva raised several federal constitutional claims, the Massachusetts Appeals Court issued only a memorandum and order pursuant to local rule 1:28. Commonwealth v. Edson Silva, 84 Mass. App. Ct. 1125; 999 N.E.2d 503; 2013 Mass. App. Unpub. LEXIS 1207 (2013).  Besides vacating a sentence that was clearly duplicative, the Appeals Court only specifically addressed three other issues.

First, Silva claimed that the judge's inadequate jury instructions that shifted the burden of proof and violated Silva's federal constitutional rights to due process and a fair trial.  As to Silva's federal constitutional claim that the judge's jury instructions were burden shifting, inadequate, and erroneous, the Appeals Court analyzed only whether the judge's reasonable doubt instruction was sufficient under Massachusetts state case law.

The Appeals Court decision does not expressly address Silva's federal constitutional claims regarding the jury instructions or the reasonable doubt instructions in particular. The Appeals Court decision does not contain any federal citations to federal cases that address the federal constitutional claim raised by Silva. The Appeals Court decision entirely failed to address Silva's federal constitutional claim that the judge erred by failing to give additional instructions on his theories of defense.

The Appeals Court acknowledged that the judge's deviation from the model reasonable doubt instruction was "not optimal", but found no error because the judge conveyed the "active ingredients" required under Massachusetts state law precedent. The Appeals Court cited to Commonwealth v. Webster, 59 Mass. 295, 5 Cush. 295, 320 (1850), but that citation was only to a state law definition of reasonable doubt without any federal citations or any express discussion of federal constitutional rights, and to Commonwealth v. Little, 384 Mass. 262, 267 n.4 (1981), but that citation again only involved a state law discussion of reasonable doubt without any federal citations or any express discussion of federal constitutional rights. The Appeals Court decision also contained a pin-citation to page 545 of Commonwealth v. Watkins, 433 Mass. 539, 545 (2001). Although there are federal citations elsewhere in that case, the case itself dealt with an issue of waiver, and the specific page citation contained only an analysis of whether the jury instructions contained the active ingredients of a reasonable doubt instruction as defined by the state case of Commonwealth v. Webster. Id. The Appeals Court decision also contains a pin-citation to Commonwealth v. Gagliardi, 418 Mass. 562, 569 (1995). That case does admittedly contain federal citations on the issue of reasonable doubt, but those citations appear related to a challenge to "moral certainty" language. See id. That case does not clearly address the federal constitutional issues that Silva raised with respect to the jury instructions at his

trial.  As such, the Massachusetts cases cited by the Appeals Court do not clearly address the federal constitutional issues raised by Silva.  Moreover, the text of the Appeals Court decision rebuts any presumption because it is clear that the Appeals Court analyzed the issue only as whether the trial judge's jury instruction on reasonable doubt conveyed the active ingredients from Commonwealth v. Webster.  The Appeals Court decision clearly did not contemplate the federal constitutional issues raised by Silva.  The Massachusetts Appeals Court relied solely on state standards that did not implicate federal constitutional issues. See Clements v. Clarke, 592 F.3d 45 (1st Cir. 2010); DiBenedetto v. Hall, 272 F.3d 1, 6-7 (1st Cir. 2001).

Based on the Massachusetts Appeals Court's decision on the reasonable doubt instruction claim (and failure to address Silva's federal constitutional claims regarding the jury instructions), this Court should find that the federal constitutional claims relating to the jury instructions were not adjudicated on the merits.  See White v. Woodall, 134 S. Ct. 1697 (2014); Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013); Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).  This Court should review this claim de novo.

The second claim analyzed by the Massachusetts Appeals Court deals with the prosecutor's closing argument.  The Appeals Court decision does not expressly address Silva's federal constitutional claim regarding the prosecutor's closing argument.  The Appeals Court decision does not contain any federal citations to federal cases that address the federal constitutional claim raised by Silva.

Of the seven Massachusetts state cases cited by the Appeals Court, only two warrant discussion.  One – Commonwealth v. Ridge, 455 Mass. 307, 330 (2009), contains no federal citations but contains a citation to another Massachusetts case that in turn cites

21

to a federal case.  However, that kind of attenuation should not be deemed an adjudication on the merits, and the federal case deals only with proper inferences in closing argument- not with the specific federal constitutional claims raised by Silva.  A second case cited - Commonwealth v. Dunker, 363 Mass. 792, 800 (1973) - contains a citation to a First Circuit decision only to point out that there was no damaging information revealed by the prosecutor's closing argument.  Neither the Dunker case nor the case cited therein clearly addresses Silva's specific federal constitutional claims regarding the prosecutor's closing argument.  The Massachusetts Appeals Court relied solely on state standards that did not implicate federal constitutional issues.  See Clements v. Clarke, 592 F.3d 45 (1st Cir. 2010); DiBenedetto v. Hall, 272 F.3d 1, 6-7 (1st Cir. 2001).  As such, this Court should find that the federal constitutional claim was not adjudicated on the merits.  See White v. Woodall, 134 S. Ct. 1697 (2014); Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013); Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).  This Court should review the claim de novo.

The third and final issue expressly analyzed by the Massachusetts Appeals Court is a Fourth Amendment claim that the Appeals Court characterized as "Motion to Suppress."[3] As to the denial of the motion to suppress, the Appeals Court cited to Terry v. Ohio, 392 U.S. 1, 21 (1968) for the issue of whether the police had a reasonable suspicion to stop and seize Silva.  Although the Appeals Court did not actually analyze Silva's federal constitutional claims regarding his seizure, Silva acknowledges that there is a federal citation in the decision.  See Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).

---

[3] Silva acknowledges that Fourth Amendment claims are not ordinarily cognizable in a habeas petition.

More important than the state court's analysis of those three claims is the fact that the Appeals Court decision failed to analyze Silva's other federal constitutional claims. Silva also raised several other federal constitutional claims, including the failure to prove and plead the absence of a firearm license as an element of unlawful possession in violation of Silva's 5th, 6th, and 14th Amendment rights to due process and a fair trial; the violation of Silva's 2nd Amendment rights based on the language of the firearm statute; the judge's trial rulings that deprived Silva of his 5th, 6th, and 14th Amendment rights to due process and to a fair trial and to present a complete defense (including the judge's exclusion of exculpatory evidence that would have shown the gun was moved prior to being photographed, exclusion of impeachment evidence, restriction of cross-examination, instruction that the jury should disregard Silva's defense, denial of a requested continuance and failure to issue a capias to force the Boston Police Department to honor a subpoena); the judge's violation of Silva's 5th, 6th, and 14th Amendment due process and fair trial rights by the failure to give additional jury instructions on Silva's theory of defense (including that mere knowledge and presence near a firearm is constitutionally insufficient and that the jury should view claimed unrecorded statements with care); the violation of Silva's federal constitutional rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments after a prosecution witness violated a pretrial order and gave improper opinion testimony during a trial ambush that the trial judge failed to correct; the prosecutor's use of a substitute forensic witness in violation of Silva's federal constitutional right to confront witnesses and due process pursuant to the 5th, 6th, and 14th Amendments; the violation of Silva's federal constitutional rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments caused by the clerk reading the wrong charges to the jury and the judge failing to grant a mistrial; the violation of Silva's federal

constitutional rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments by the prosecutor twice eliciting that police knew Silva from prior interactions; and the violation of Silva's federal constitutional rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments by the cumulative impact of all the constitutional errors at trial.  The Appeals Court decision did not analyze any of these federal constitutional claims.

Instead of addressing all of Silva's federal constitutional claims, the Appeals Court decision contained only the following footnote:  "To the extent that we do not address separately each of the defendant's other contention, they have not been overlooked.  We find nothing in them that requires discussion."  Commonwealth v. Edson Silva, 84 Mass. App. Ct. 1125; 999 N.E.2d 503; 2013 Mass. App. Unpub. LEXIS 1207 (2013).  This Court should find that these federal constitutional claims were not adjudicated on the merits.  See White v. Woodall, 134 S. Ct. 1697 (2014); Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013); Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).  This Court should review the claims de novo.

Because the Massachusetts Appeals Court failed to specifically address several of Silva's federal constitutional claims, the case law suggests that this habeas court should presume (subject to rebuttal) that the federal claim was adjudicated on the merits.  Johnson v. Williams, 133 S. Ct. 1088, 1091 (2013).  Silva objects to any such presumption, where the plain text of the Appeals Court decision does not support it.

But even if such a presumption is ever appropriate, Silva asserts here that he can rebut such a presumption.  In particular, the language of the Appeals Court decision states that Silva's claims do not require "discussion."  A judgment is rendered "on the merits" only if it was "delivered after the court . . . heard and evaluated the evidence and the

parties' substantive arguments." Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013).  There has been no evaluation and analysis of Silva's federal constitutional claim because the Appeals Court expressly and deliberately chose not to even discuss them.  See id.  Cf. Hodge v. Mendonsa, 739 F.3d 34, 41 (1st Cir. 2013)(Massachusetts Appeals Court citation to a state case that specifically involved the federal due process issue, along with articulation of reasons why federal claim would fail, was an adjudication on the merits).

Additionally, the content of Silva's unaddressed federal constitutional claims is such that adjudication on a federal constitutional basis cannot be presumed from a silent record.  For example, Silva claimed that his rights to due process were violated by the prosecutor's failure to plead and prove the absence of a valid firearm license as an element of unlawful firearm possession and that the recent United States Supreme Court case Alleyne v. United States, 133 S.Ct. 2151 (2013) supports this unique claim.  The impact of Alleyne on this issue has never been addressed by Massachusetts appellate courts, and yet the Appeals Court declined to discuss the federal constitutional issue.  Notably, the Appeals Court did not specifically list the federal constitutional issues that it was declining to discuss, and so it cannot be said with confidence that claims were not overlooked.

Moreover, this Court should look to the claims that the Appeals Court did analysis in deciding whether the unaddressed claims were considered as federal constitutional claims and were adjudicated on the merits.  All of Silva's claims are federal constitutional claims, and yet the Appeals Court decision never once mentions any federal constitutional rights.  The Appeals Court decision re-characterized Silva's jury instruction claim and prosecutorial misconduct claim as state law issues and analyzed them by considering only state law cases.  The state appellate court relied solely on state standards that did not implicate federal constitutional issues. If that is what the Appeals Court did with the claims

that it addressed in writing, it cannot be presumed that the Appeals Court did more with the claims that the Appeals Court declined to even discuss.

Based on the facts of this case, the nature of Silva's federal constitutional claims, and the text of the Appeals Court decision, this Court should find that Silva has rebutted any presumption of an adjudication on the merits for the claims that the Appeals Court declined to address.   See White v. Woodall, 134 S. Ct. 1697 (2014); Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013); Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).   It cannot be said with confidence that none of Silva's federal constitutional claims were inadvertently overlooked, and there was no fair adjudication on the merits of claims as defined by 28 U.S.C. sec. 2254(d) (1). See DiBenedetto v. Hall, 272 F.3d 1, 7 (1st Cir. 2001); Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001) (recognizing a federal court cannot defer to a state court on an issue that the state court did not address).

For these reasons, if this Court holds that AEDPA even applies, this Court should review the following unaddressed claims de novo:

1-  the prosecutor's failure to plead and prove the absence of a firearm license as an element of the crimes, and the shifting of the burden of proof for this fact, which violated Silva's 5th, 6th, and 14th Amendment rights to due process and a fair trial;

2-  the violation of Silva's 2nd Amendment rights based on the language of the firearm statute;

3-  the judge's trial rulings that deprived Silva of his federal constitutional rights to due process and to a fair trial and to present a complete defense pursuant to the 5th, 6th, and 14th Amendments (including the judge's exclusion of exculpatory

evidence that would have shown the gun was moved prior to being photographed, exclusion of impeachment evidence, restriction of cross-examination, instruction that the jury should disregard Silva's defense, denial of a requested continuance and failure to issue a capias to force the Boston Police Department to honor a subpoena);

4- the judge's violation of Silva's rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments by the failure to give additional jury instructions on Silva's theory of defense (including that mere presence near a firearm is constitutionally insufficient and that the jury should view claimed unrecorded statements with care);

5- the violation of Silva's federal constitutional rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments after a prosecution witness violated a pretrial order and gave improper opinion testimony during a trial ambush that the trial judge failed to correct;

6- the prosecutor's use of a substitute forensic witness in violation of Silva's federal constitutional right to confront witnesses and due process pursuant to the 5th, 6th, and 14th Amendments;

7-  the violation of Silva's federal constitutional rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments caused by the clerk reading the wrong charges to the jury and the judge failing to grant a mistrial;

8- the violation of Silva's federal constitutional rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments by the prosecutor twice eliciting that police knew Silva from prior interactions;

9- and the violation of Silva's federal constitutional rights to due process and a fair

trial pursuant to the 5th, 6th, and 14th Amendments by the cumulative impact of

all the constitutional errors at trial.

## ARGUMENT

I.  **SILVA'S FEDERAL CONSTITUTIONAL CLAIMS SHOULD BE
    REVIEWED IN ACCORDANCE WITH ARTICLE III OF THE UNITED
    STATES CONSTITUTION AND NOT THE ANTITERRORISM AND
    EFFECTIVE DEATH PENALTY ACT OF 1996.**

Silva's previous discussion about standards of review and relevant case law under

AEDPA does not mean that Silva requests such review or believes such review is

constitutionally appropriate.

This Honorable Court should review Silva's claims de novo, after a full evidentiary

hearing, and should consider such claims in light of all controlling federal law -  rather

than only in light of clearly established Supreme Court precedent.  The Antiterrorism and

Effective Death Penalty Act of 1996 (AEDPA) contravenes the Article III authority of

federal district court judges and is unconstitutional.  As such, this Court should not adhere

to its standards.

AEDPA unconstitutionally confines an Article III judge's ability to determine the

constitutionality of a prisoner's detention.  AEDPA prohibits a federal court from granting

an application for a writ of habeas corpus with respect to a claim adjudicated on the merits

in state court unless that adjudication resulted in a decision that was contrary to, or

involved in an unreasonable application of clearly established federal law, as determined

by the Supreme Court of the United States.  28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529

U.S. 362, 399 (2000).   This limits the ability of the habeas court to consider the "full array

of federal cases" and limits the courts authority to cases of unreasonable application of the

already confined area of law.   <u>Evans v. Thompson</u>, 524 F.3d 1, 1-2 (2008) (Lipez, J.,

dissenting).  Cf. <u>Johnson v. Williams</u>, 133 S. Ct. 1088 (2013)(not analyzing an Article III

claim).

This standard of review violates Article III of the United States Constitution, which

mandates that the judicial power shall extend to all cases arising in law or equity under the

Constitution or laws of the United States.  U.S. Const. Article III, clause 2.   It is well

settled that once Congress has granted jurisdiction to the courts, as congress has with

petitions for writ of habeas corpus, it cannot then dictate how the courts exercise their

judicial power.  <u>See Evans</u>, 524 F.3d at 2 (Lipez, J., dissenting).   AEDPA's act of

"limiting the sources of law a federal court may rely upon in granting habeas relief"

impinges upon the federal court's Article III power by forcing judges to ignore binding and

persuasive precedents in determining if a petitioner is being held in violation of the

Constitution.  <u>Id.</u> at 3.  Thus, because AEDPA "represent[s] a fundamental breach of the

separation of powers-an unconstitutional intrusion by Congress into the federal judiciary's

independent and exclusive duty to 'say what the law is'" its application is unconstitutional.

<u>Crater v. Galaza</u>, 508 F.3d 1261 (9th Cir. 2007) (Reinhardt, J., dissenting) (quoting

<u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137 (1803)); <u>Davis v. Straub</u>, 445 F.3d 908 (6th

Cir. 2006) (Martin, J., dissenting); <u>Irons v. Carey</u>, 505 F.3d 846, 854 (9th Cir. 2007)

(Noonan, J., concurring); <u>Lindh v. Murphy</u>, 96 F.3d 856, 885 (7th Cir. 1996) (Ripple, J.,

dissenting).

Therefore, this Court should review Silva's claims de novo and in light of all

controlling federal law, not merely clearly established Supreme Court precedent.

**II.      UNDER ANY STANDARD OF REVIEW, THE CONVICTIONS MUST BE REVERSED BECAUSE THE STATE COURT RULINGS ON SILVA'S FEDERAL CONSTITUTIONAL CLAIMS WERE CONTRARY TO AND AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

As analyzed briefly above, Silva's federal claims of constitutional violations were not adjudicated on the merits of these claims as defined by 18 U.S.C. sec. 2254(d) (1).  As such, this court should review these legal claims de novo and reverse Silva's convictions. Silva also maintains the AEDPA is unconstitutional in that it limits this Court's authority, and as such this Court should consider all claims do novo and in light of controlling law that is not limited to clearly established Supreme Court precedent.  However, if this Court adheres to Congress's partial mandate of judicial authority under AEDPA, those claims should to considered under the AEDPA standard.

As discussed herein, under de novo review Silva's convictions must be reversed. However, even if a more deferential standard of review is used, the convictions still must be reversed.  Under any standard of review, the Massachusetts state courts erred as a matter of federal constitutional law.  There were serious federal constitutional errors at Silva's trial, the Appeals Court failed to adjudicate the merits of important federal constitutional claims, and there were decisions in the state court proceedings that were both contrary to - and an unreasonable application of - clearly established precedent from the United States Supreme Court.  Silva was prejudiced by the federal constitutional errors and it cannot be said that the verdict would be the same if the errors had not occurred and if Silva had received due process and a fair trial.

For these reasons, Silva respectfully requests that this Court vacate his convictions and grant him a new trial.

1. **THE PROSECUTION FAILED TO PLEAD AND PROVE THAT SILVA LACKED A LICENSE TO CARRY A FIREARM AS AN ELEMENT OF UNLAWFUL POSSESSION AND THE BURDEN WAS SHIFTED, IN VIOLATION OF SILVA'S 5TH, 6TH, AND 14TH AMENDMENT RIGHTS TO DUE PROCESS AND A FAIR TRIAL, AND THE APPEALS COURT RULING ON THIS CLAIM IGNORED CLEARLY ESTABLISHED SUPREME COURT PRECEDENT.**

It is clearly established by the United States Supreme Court that the prosecution must prove every fact necessary to constitute the crime charged in order for the defendant to be found guilty beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364 (1970). As a matter of federal constitutional law, a lack of a license is a factual element of the offense of "possession of a firearm without a license" that the prosecution must plead and prove. See In re Winship, 397 U.S. 358 (1970) (explicitly holding the due process clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged); Gonzales v. Dickhaut, 2010 WL 495559 (D. Mass. 2010). Additionally, under recent clearly established Supreme Court precedent, any fact that increases a mandatory minimum sentence is an element that must be proven to a jury. Alleyne v. United States, 133 S.Ct. 2151 (2013).

In this case, the Massachusetts Appeals Court failed to address Silva's federal constitutional claim that his federal due process rights were violated because the prosecutor failed to plead and prove that Silva lacked a valid firearm license – instead shifting the burden to Silva to prove that he had a license, despite that the crime prohibited only unlawful possession. The failure of the Appeals Court to analyze this claim is particularly troubling in light of new clearly established United States Supreme Court precedent in the form of the holding in Alleyne v. United States, 133 S.Ct. 2151 (2013).

In Alleyne, the Supreme Court held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." Id. The Alleyne Court

further held, "the essential Sixth Amendment inquiry is whether a fact is an element of the crime.  When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." Id.

The Alleyne ruling supports Silva's argument that requiring Silva to prove he had a license to carry a gun found on the street violated his 5th, 6th, and 14th Amendment due process rights, and Alleyne is applicable to Silva's pending case.  See Griffith v. Kentucky, 479 U.S. 14, 107 (1987).  Under Alleyne, "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury."  Alleyne v. United States, 133 S.Ct. 2151 (2013)(emphasis added).   Under Massachusetts statutory law, the absence of a license is a fact that subjects defendants to a mandatory minimum firearm sentence.  See, e.g.,  M.G.L.  c.269  sec.10(a)  ("Whoever…knowingly  has  in  his  possession…a firearm…shall be punished by imprisonment…for not less than 18 months…in a jail or house of correction…No person having in effect a license to carry firearms…shall be deemed to be in violation…"). Because the existence of a license subjects citizens to mandatory minimum punishments, the factual existence or absence of a license is "an element that must be submitted to the jury" for the firearm crimes for which Silva was convicted. See Alleyne v. United States, 133 S.Ct. 2151 (2013).  As such, the prosecution must be required to prove the absence of a firearm license, and it is an unconstitutional violation of Supreme Court precedent to shift the burden to defendants to prove they have a license.  Id.

Although the Alleyne case involved the 6th Amendment right to a jury trial, its holding implicates the 5th, 6th, and 14th Amendment rights - to due process and to have the Commonwealth prove the charged crimes beyond a reasonable doubt - because the holding

involved "elements" of a firearm crime and due process requires that the Commonwealth prove every element of a firearm crime beyond a reasonable doubt. See Sullivan v. Louisiana, 508 U.S. 275 (1993)("the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated."); Francis v. Franklin, 471 U.S. 307 (1985); In Re Winship, 397 U.S. 358 (1970).

Alleyne effectively overrules all Massachusetts state court precedent that held that a license was not an element of the crime of possession of a firearm (if such a burden-shifting holding was ever constitutional in the first place). See, e.g., Commonwealth v. Powell, 459 Mass. 572, 582 (2011). See also Alleyne v. United States, 133 S.Ct. 2151 (2013).

At Silva's trial, there was no evidence presented by the Commonwealth at trial that Silva lacked a license to carry a firearm. As a result, the jury could not infer beyond a reasonable doubt that Silva was unlicensed, and the evidence was insufficient to prove his guilt beyond a reasonable doubt, in violation of his due process rights pursuant to the 5th, 6th, and 14th Amendments. Jackson v. Virginia, 443 U.S. 307 (1979); In Re Winship, 397 U.S. 358 (1970).

Additionally, the trial judge instructed the jury that to find Silva guilty of possession of a firearm without a license, they merely had to find that Silva possessed the firearm. (II-88). The judge violated Silva's federal constitutional rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments because she did not instruct the jury that the prosecution had to prove that Silva lacked a valid firearm license in order to be found guilty. Francis v. Franklin, 471 U.S. 307 (1985). Further, requiring that Silva prove he has a license to carry impermissibly shifted the burden of proof and violated

Silva's right to due process under the 5th, 6th and 14th Amendments.  In Re Winship, 397

U.S. 358 (1970).

Finally, the alleged firearm was found on the street and was not in the actual

possession of Silva. (I-93). Silva asserted his innocence, held the Commonwealth to its

burden of proof, and raise a defense that the alleged firearm was not his.  (See, e.g., II-68-

69). Because the firearm was found near a car on a street and was not actually possessed by

Silva, Silva was in no better position than the Commonwealth to produce evidence of a

third party's license to carry that firearm.  See Apprendi v. N.J., 530 U.S. 466 (2000).

The Appeals Court did not address the merits of this issue in Silva's case.  The

Massachusetts Supreme Judicial Court seemingly recognized the constitutional issues

present in such a scenario and attempted to craft a solution (a solution that was not applied

to Silva's case and also does not cure the ultimate problem).  Commonwealth v. Delanie

Humphries, 465 Mass. 752 (2013)(when a defendant is charged with joint venture

possession of a firearm, the burden of proof is on the Commonwealth to prove that the co-

venturer lacked a license to carry).   Because Silva did not have actual possession of the

firearm (and because it was found on a public street where it could have been discarded by

any number of unknown persons or co-venturers), placing the burden on Silva to prove that

a third-party owner of the firearm had a license violated his federal due process rights

pursuant to the 5th, 6th, and 14th Amendment rights. See Alleyne v. United States, 133 S.Ct.

2151 (2013).  Apprendi, 530 U.S. 466 (2000); Francis, 471 U.S. 307; Winship, 397 U.S.

358; Gonzales, 2010 WL 495559 (D. Mass. 2010); Humphries, SJC-11237 (2013).

Ultimately, the prosecutor's failure to prove the absence of a license beyond a

reasonable doubt, along with the judge's jury instructions omitting that requirement despite

that the firearm charges contained a mandatory minimum, violated Mr. Silva's rights to be

convicted only upon proof beyond a reasonable doubt of all elements, to due process, to a fair trial, and to a jury trial pursuant to the 5th, 6th, and 14th Amendments.  See Alleyne v. United States, 133 S.Ct. 2151 (2013).  Apprendi v. N.J., 530 U.S. 466 (2000); Francis, 471 U.S. 307 (1985); Winship, 397 U.S. 358 (1970); Gonzales v. Dickhaut, 2010 WL 495559 (D. Mass. 2010). See also Jackson v. Virginia, 443 U.S. 307 (1979).

This Court should hold that based on the applicable constitutional law and clearly established Supreme Court precedent, absence of a firearm license is an element of the crime of unlawful possession of a firearm.  As the Appeals Court did not analyze this federal constitutional issue, this Court should review the issue de novo and reverse Silva's convictions.  However, given that the Commonwealth failed to plead and prove a required element in this case, the Appeals Court decision is an unreasonable application of Supreme Court law even if the Appeals Court secretly adjudicated the merits of this claim.  White v. Woodall, 134 S. Ct. 1697 (2014); Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013); Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).

For these reasons, this Court should vacate Silva's unconstitutional convictions.

**2. THE PROSECUTION AND CONVICTION OF SILVA FOR POSSESSION OF A FIREARM VIOLATES SILVA'S 2ND AMENDMENT RIGHTS BECAUSE THE STATUTORY CRIME AS DEFINED – KNOWING POSSESSION OF AN OPERABLE FIREARM – CREATES A GENERAL PROHIBITION AGAINST BEARING ARMS AND THE APPEALS COURT DECISION IS CONTRARY TO THE 2ND AMENDMENT AND CLEARLY ESTABLISHED SUPREME COURT PRECEDENT.**

Under the 2nd Amendment, individuals are guaranteed the right to possess and carry weapons in case of confrontation; this right cannot be infringed upon by the federal or state government.  U.S. Const. Amend. 2; District of Columbia v. Heller, 554 U.S. 570, 592

(2008); McDonald v. City of Chicago, 130 S.Ct. 3020, 3023 (2010).  Analysis of 2nd Amendment rights ordinarily starts at the constitutional right and ends at an analysis of whether restrictions upon the right are themselves constitutional.

However, Massachusetts state law has reversed the process and set forth a system where there is a general prohibition against bearing arms.  M.G.L. c. 278, § 7 creates a mandatory presumption that an individual in possession of a firearm is not licensed, rendering *any* possession of a firearm presumptively unlawful. See M.G.L. c. 269, § 10; Commonwealth v. Jones, 372 Mass. 403, 405 (1977)(holding of a valid license brings defendant within an exception to the *general prohibition against carrying a firearm*).  This "general prohibition" in Massachusetts violates Silva's 2nd amendment right to keep and bear arms and is contrary to clearly established Supreme Court precedent.  See McDonald, 130 S.Ct. at 3023 (holding states cannot impose a general prohibition against carrying a firearm without violating the 2nd amendment); Heller, 554 U.S. at 592.

The Massachusetts Appeals Court failed to analyze this federal constitutional claim, either on its own or in connection with Silva's related claim regarding the burden of proving the absence of a valid firearm license.  As such, de novo review is appropriate. Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).   However, even adjudication on the merits is presumed, the Massachusetts Appeals Court decision is contrary to – and an unreasonable application of – clearly established United States Supreme Court precedent and the 2nd Amendment.  See McDonald, 130 S.Ct. at 3023); Heller, 554 U.S. at 592.

Under any standard of review, the violation of Silva's 2nd Amendment rights warrants reversal of his firearm convictions.  See McDonald, 130 S.Ct. at 3023.  This Court should vacate Silva's convictions.

**3. THE APPEALS COURT DECISION WAS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT PRECEDENT REGARDING THE RESTRICTIONS ON THE DEFENSE THAT DEPRIVED SILVA OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL AND TO PRESENT A COMPLETE DEFENSE PURSUANT TO THE 5TH, 6TH, AND 14TH AMENDMENTS.**

The Appeals Court decision was contrary to clearly established Supreme Court precedent by failing to hold that the trial rulings and restrictions on the defense deprived Silva of his federal constitutional rights to due process and to a fair trial and to present a complete defense pursuant to the 5th, 6th, and 14th Amendments. Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006). These rulings include the judge's exclusion of exculpatory evidence that would have shown the gun was moved prior to being photographed, exclusion of exculpatory impeachment evidence, restriction of cross-examination, instruction that the jury should disregard Silva's defense, denial of a requested continuance and failure to issue a capias to force the Boston Police Department to honor a subpoena. As discussed below, the Appeals Court did not analyze this issue and so de novo review is appropriate. Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010). But even if the Appeals Court were deemed to have adjudicated the merits of this claim, any ruling suggesting it was constitutional to prevent Silva from introducing exculpatory and non-cumulative evidence at trial to support his defense is a ruling that is contrary to clearly established Supreme Court precedent. Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006).

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a `meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. at 324; Crane v. Kentucky, 476

U.S. 683, 690 (1986).  That right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14 (1967).  This right clearly includes a defendant's right to

present witnesses in his own defense.  Chambers v. Mississippi, 410 U.S. 284 (1973).

The right to present a defense is subject to "reasonable restrictions." United States

v. Scheffer, 523 U.S. 303, 308 (1998).   However, those restrictions cannot abridge a

defendant's right to present a defense.  Where exculpatory evidence is excluded under state

rules of evidence that "infringe upon a weighty interest of the accused" and are "arbitrary"

or "disproportionate to the purposes that they are designed to serve," a constitutional

violation may occur. Holmes, 547 U.S. at 325.

Moreover, even if a state evidentiary rule is "generally defensible," it may under

certain circumstances produce an unconstitutional result. White v. Coplan, 399 F.3d 18, 24

(1st Cir. 2005).   Among the factors bearing on that inquiry are the importance of the

evidence to an effective defense, the scope of the exclusion, the evidence's strength and

reliability, and the strength of the state's interests in excluding the evidence. White, 399

F.3d at 24; Fortini, 257 F.3d at 46.

In this case, the judge erred as a matter of federal constitutional law by repeatedly

restricting Silva from presenting a defense.   Holmes v. South Carolina, 547 U.S. at 324.

The trial judge erred in restricting the cross-examination of a police officer by refusing to

allow trial counsel to impeach him with the information of a CAD (Computer Assisted

Dispatch) sheet, and then by mistakenly instructing the jury to completely disregard Silva's

theory of defense.  The CAD sheet directly contradicted the officer's claim that another

officer took photographs of the firearm before it was moved.  The judge then erred in

refusing to continue the trial or issue a capias where the Boston Police Department failed

to respond to a valid subpoena. The judge refused to continue the trial for a half a day or issue a capias to secure the witness stating that it would be futile.

The Commonwealth's entire case against Silva rested on the testimony of Officer McCormack who testified that a firearm was recovered under the same vehicle Silva bent down next to. (I-95). Officer Hancock, who responded to the scene after Silva was arrested, testified that the firearm was in a box on the hood of a police cruiser when he arrived. (I-202, 205). However, according to the Computer Assisted Dispatch ("CAD") sheet, the officer who responded to the scene to take photographs did not arrive until after Officer Hancock arrived. (Trial Exhibit A). Defense counsel attempted to impeach the officer with the CAD sheet to show that the photographs of the firearm could not have been taken before Officer Hancock arrived unless someone <u>moved</u> the gun prior to taking the photographs. (I-210).[4] This would have provided evidence that an officer had moved the gun, thereby creating reasonable doubt.

Although Silva tried to introduce the exculpatory form and impeach the officer with a form regularly used by the Boston Police Department which the witness had seen "more time than he could begin to count" the judge instructed the jury to disregard all testimony relating to the CAD sheet. (I-223). The trial judge erred by instructing the jury to disregard the CAD evidence and Silva's theory of defense. Specifically, of the proffered CAD evidence that created reasonable doubt as to the credibility of the police story, the Court told the jury to "disregard all of this," stating, "When I say you disregard this, you disregard this." (I-223).

---

[4] Officer Hancock testified that he has looked at more CAD sheets in his career than he could even begin to count. (I-215). However, when asked to review the CAD sheet to indicate what time he arrived on scene, Officer Hancock stated that he did not know how to read the form and insisted that the numbers listed next to each officer's name did not reflect the time each of the officers arrived on scene. (I-222).

After Officer Hancock claimed that he did not know how to read a CAD sheet, Silva subpoenaed the keeper of records of the Boston Police Department to appear on day two of trial in order to admit the CAD sheet into evidence.  (II-41).[5]  However, the keeper of records failed to appear because when the constable attempted to serve the subpoena, the Boston Police Department claimed it was their policy to refuse service of subpoenas after 5:00 p.m.  (II-42).  Defense counsel stressed how important the witness was for Silva's defense but the court refused to issue a capias or continue the trial for one day so Silva could attempt to re-serve the Boston Police Department.  (II-44).

When defense counsel explained that the Boston Police Department was refusing to respond to a subpoena merely because it was served after 5:00 p.m., the trial judge stated, "You, Ms. Scapicchio, have placed your reasons on the record, and yesterday you also placed your ex parte on the record, your reasons for seeking to have this CAD sheet put in to evidence in some form or fashion.  So I think the objection is preserved pretty well for the record.  I'm not issuing any capiases for the Boston Police Department because it would be futile in any case…You have your opinions as to how valid your defense will be and you have placed a proffer on the record, and that should do very well for the appellate court's consideration of these issues.  So we have to keep going now…"  (II-44, 46).

Although the prosecutor alleged during trial that Silva should have anticipated the need to call the keeper of records well before the first day of trial, this is disingenuous.  (II-36).  There was no need for the CAD sheet until Officer Hancock testified on direct that the box containing the firearm was on the hood of the cruiser before he arrived; this testimony could not have been anticipated by defense counsel nor could she anticipate the

---

[5] During Officer Hancock's testimony, defense counsel made an offer of proof as to why the exculpatory CAD sheet was vital to Silva's defense.  (I-210).

officer would claim he did not know how to read a CAD sheet although he had read them "too many times to count."

The exculpatory evidence that the defense sought to present was not cumulative of any other evidence.  The keeper of records was the only person who could provide evidence to impeach Officer Hancock and show that the firearm may have been moved before the photographs were taken.  Refusing to compel the witness to attend trial prejudiced Silva because if the jury heard evidence of the timeline of events, the jury could have inferred the firearm was moved prior to the photographs being taken thereby creating reasonable doubt. See Chambers, 410 U.S. 284, 302 (1973).

Silva asserts that these restrictions upon his defense violated his federal constitutional rights to due process, to a fair trial, and to a meaningful opportunity to present a complete defense, pursuant to the 5th, 6th, and 14th Amendments, as clearly established by Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006).

There are several reasons why the judge's actions rose to the level of constitutional error.  First, the excluded evidence was "highly probative" and "absolutely critical to the defense." Fortini, 257 F.3d at 47.  Here, the excluded evidence and testimony was highly probative of whether the police were credible and whether the Commonwealth could prove beyond a reasonable doubt that Silva possessed the gun that no one saw him possess.  Silva's fingerprints were not on the gun and no one saw him drop it.  The Commonwealth's case rested on Silva being the closest person to where the gun was found.  It was absolutely critical that the jury hear evidence from the defense that would have raised a reasonable doubt as to whether the gun was moved and how likely it was for a gun to be found on that street.  Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006). Cf. Hodge v. Mendonsa, 739 F.3d 34, 41 (1st Cir. 2013).

Second, the excluded evidence was not merely cumulative; it was the only evidence that Silva could have introduced to support his theory of defense.  In evaluating a trial court's exclusion of defense evidence, the First Circuit has distinguished situations in which a trial court's evidentiary limitation foreclosed the introduction of any testimony to support a defendant's theory of defense from those in which a defendant retains an adequate opportunity to present his theory of the case. See United States v. Mulinelli-Navas, 111 F.3d 983 (1st Cir. 1997); Brown v. Ruane, 630 F.3d 62 (1st Cir. 2011).  Here, Silva did not have any other way to convey to the jury the crucial evidence that the judge excluded and told the jury to "disregard."  See Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006).

Third, there were no persuasive reasons for the judge's actions and certainly no reasons that outweighed Silva's constitutional rights.  The judge's decisions in this case – restricting cross-examination, excluding evidence, denying the requested continuance, and denying the capias when the police failed to honor a subpoena -  appear to be arbitrary. But even if the judge was motivated by a desire to finish the trial quickly, adding an extra hour or an extra day to a very short trial is not the kind of delay that would outweigh the right to present a complete defense.  Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006).  While the trial court has an interest in ensuring trials proceed expeditiously, this interest should not outweigh a defendant's right to present a valid defense. Washington v. Texas, 388 U.S. 14 (1967).  This is especially true where a government witness is ignoring a valid subpoena under the guise of a rule fabricated by the Boston Police to avoid appearing at trial on a defendant's behalf and where Silva was requesting a negligible continuance.

Finally, these combined erroneous restrictions and exclusions were not harmless beyond a reasonable doubt. As set forth by the Supreme Court, the test is "whether the error had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). The prosecution bears the burden of establishing harmlessness. Sinnott v. Duval, 139 F.3d 12, 15 (1st Cir. 1998); O'Neal v. McAninch, 513 U.S. 432, 436 (1995). When a habeas proceeding leaves a court "in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." Sanna v. DiPaolo, 265 F.3d 1, 14 (1st Cir. 2001). Here, it cannot be said with confidence that the verdict would be the same if the judge had not prevented the jury from hearing Silva's defense. This was a case where Silva was never seen possessing the firearm and the firearm was merely found on the ground in a high crime area. Although it is plausible for a jury to believe that Silva may have leaned down near where the gun was found, the police officer did not see Silva drop a gun or drop any object. If that same jury had heard that the gun had been moved before it was photographed, heard a police officer impeached with a CAD sheet, and heard cross-examination that made the police officers look less credible, the jury likely would have had reasonable doubts about whether the Commonwealth proved its case beyond a reasonable doubt. Instead, the judge's unconstitutional restrictions left Silva with only his attorney's closing argument to support his defense. Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006).

The Massachusetts Appeals Court failed to analyze these federal constitutional claims regarding the restrictions upon Silva's defense. As such, de novo review is appropriate. Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010). However, even adjudication on the merits is presumed, the

Massachusetts Appeals Court decision is contrary to – and an unreasonable application of – clearly established United States Supreme Court precedent on the right to present a complete defense.  Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006).  Under any standard of review, this prejudicial error warrants relief.  This Court should vacate Silva's convictions.

4. **THE JURY INSTRUCTIONS VIOLATED SILVA'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE 5th, 6TH, AND 14TH AMENDMENTS AND THE STATE APPEALS COURT RULING ON SILVA'S CLAIMS IGNORED UNITED STATES SUPREME COURT PRECEDENT.**

The United States Supreme Court has clearly established that the prosecution bears the burden of proof beyond a reasonable doubt of all elements of the crime.  See, e.g., United States v. Gaudin, 515 U.S. 506 (1995); Victor v. Nebraska, 511 U.S. 1 (1994); Sullivan v. Louisiana, 508 U.S. 275 (1993).  This argument is undoubtedly based upon the Due Process clause of the United States Constitution.  Likewise, jury instructions may not shift the burden of proof.  Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979).

There is perhaps no more fundamental principle governing our system of criminal justice than the "bedrock axiomatic and elementary principle" that a defendant may not be convicted of a crime in any court of this country absent proof to a jury beyond a reasonable doubt of every fact necessary to constitute the offense with which he is charged.  See, e.g., United States v. Gaudin, 515 U.S. 506 (1995); Victor v. Nebraska, 511 U.S. 1 (1994); Sullivan v. Louisiana, 508 U.S. 275 (1993); Francis V. Franklin, 471 U.S. 307, 313-14 (1985); Mullaney v. Wilbur, 421 U.S. 684, 704 (1975); In re Winship, 397 U.S. 358, 364 (1970).

Despite purported due process protection, in this case the trial judge deviated from the model reasonable doubt instruction and gave a jury instruction that lessened the Commonwealth's burden of proof, shifted the burden to the defendant, and omitted crucial phrases. This was a federal constitutional error, and the decisions in the state court proceedings on this issue were both contrary to - and an unreasonable application of - clearly established precedent from the United States Supreme Court.

Over Silva's objection (II-91), the trial judge refused to give the trial jury the model instruction for reasonable doubt. Although the judge told the parties prior to closing arguments that she would give the model reasonable doubt instruction, the judge's instructions actually contained a different instruction. (II-47). Instead, the judge gave an incomplete reasonable doubt instruction, taking a series of negative phrases and omitting crucial language. (II-87).

The complete instruction was stated as follows:

Now, we keep using the term reasonable doubt. What is proof beyond a reasonable doubt? Proof beyond a reasonable doubt does not mean proof beyond all possible or imaginary or whimsical doubt or proof beyond all possibility of innocence. A reasonable doubt does not mean the kind of doubt that can be conjured up by someone who is seeking for doubt or for an excuse to acquit a defendant. Instead a reasonable doubt means such a doubt as remains in the mind of a reasonable person who is earnestly seeking the truth. The Commonwealth is not required to prove the defendant's guilt to an absolute or mathematical certainty, the kind of certainty that you have when you add two and two and you get four. But the Commonwealth is required to prove more than a probability. They're required to prove the defendant's guilt to a moral certainty, the kind of certainty that satisfies your judgment and your consciences as reasonable men and women and leave in your mind a clear and settled conviction that the defendant is guilty.

(II-87).

This reasonable doubt instruction included language that was highly prejudicial to Silva and contrary to clearly established Supreme Court precedent. Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979). The judge erroneously

instructed the jury "a reasonable doubt does not mean the kind of doubt that can be conjured up by someone who is seeking…for an excuse to acquit the defendant." (II-87). This language, coupled with the fact that the trial judge omitted presumption of innocence language, effectively shifted the burden of proof. Instead of reiterating that Silva is presumed to be innocent, the judge essentially charged the jury that Silva was guilty and the jury should not merely conjure up reasons to acquit him.

Additionally, the incomplete instruction failed to explicitly tell the jury that if they had a reasonable doubt, they must acquit Mr. Silva. (II-87). Notably, the judge never told the jury that if they reviewed the evidence and still had a reasonable doubt remaining, Silva is entitled to the benefit of that doubt and must be acquitted. (II-80-90). This warrants reversal pursuant to Silva's 5th, 6th, and 14th Amendment rights. See Winship, 397 U.S. 358.

Further, the instruction used a series of negative phrases that confused and lessened the Commonwealth's burden of proof. The judge instructed that reasonable doubt is not "proof beyond all possibility of innocence", is not "proof beyond all possible or imaginary or whimsical doubt", and is not "the kind of doubt that can be conjured up by someone who is seeking for doubt or for an excuse to acquit a defendant." (II-87). The judge also instructed that reasonable doubt does not require "an absolute or mathematical certainty" and does not require "the kind of certainty that you have when you add two and two and you get four." (II-87). Thus, the judge instructed that certainty was not required.[6] The instruction trivialized and minimized the heavy standard of proof that is proof beyond a

---

[6] As to what reasonable doubt is, the judge instructed "reasonable doubt means such doubt as remains in the mind of a reasonable person who is earnestly seeking the truth." (II-87). The judge also stated "a moral certainty" was required. (II-87).

reasonable doubt.  See In Re Winship, 397 U.S. 358 (1970); Lanigan v. Maloney, 853 F.2d 40, 47 (1st Cir. 1988)(Any instruction that absolute certainty is not required should be balanced by a statement to the effect that belief in guilt at least *approaching* absolute certainty *was* required).

The repeated use of negative examples is confusing and minimizes the high burden imposed on the Commonwealth. Winship, 397 U.S. 358 (1970); United States v. Cassiere, 4F.3d 1006,1024 (1st Cir.1993).  Further, in Winship, the Supreme Court held that the fact-finder's mind must be in a **"**subjective state of certitude**"** and that proof beyond a reasonable doubt is the equivalent of proof to an **"**utmost certainty." 397 U.S. at 364 (emphasis added).  In this case, the reasonable doubt instruction failed to convey the need for the Commonwealth to prove that type of certainty. Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979).

In addition, the judge instructed, "Reasonable doubt does not mean the kind of doubt that can be conjured up by someone who is seeking for doubt or for an excuse to acquit a defendant."  (II-87).  The phrase "conjured up by someone" shifts the burden of proof.  See Winship, 397 U.S. 358 (1970); Dunn v. Perrin, 570 F.2d 21 (1st. Cir. 1978). See also Francis v. Franklin, 471 U.S. 307 (1985); Gilday v. Callahan, 59 F.3d 257, 264 (1st Cir. 1995).  Silva did not have to conjure up anything[7], and the judge's instruction confused and lessened the burden of proof. Winship, 397 U.S. 358 (1970).

Further, the instruction effectively banned reasonable inferences arising from the evidence or lack of evidence. An instruction that tells jurors not to consider possible or "imaginary" doubts, "while perhaps well intentioned, is tantamount to telling the jury not

---

[7] The unconstitutionality of this instruction was compounded by the prosecutor's improper closing argument, which argued that the defense was a junk drawer of distractions and implicitly suggested that Silva was trying to conjure doubt.

to consider any doubts at all." Lawrence M. Solan, <u>Refocusing the Burden of Proof in</u>

<u>Criminal Cases: Some Doubt About Reasonable Doubt</u>, 78 Tex. L. Rev. 105, 142-43

(1999). Here, the instruction effectively told the jury not to consider any "possible" doubt.

(II-87).  This negated Silva's defense of an inadequate police investigation as well as his

reasonable-doubt defense.  <u>Cage v. Louisiana</u>, 498 U.S. 39 (1990).

Next, the instruction here was unconstitutional because it defined the quality of the

doubt, rather than the strength of the proof needed, and thus shifted the burden of proof

from whether the Commonwealth had proved its case to whether Silva had raised sufficient

doubt. <u>Cage</u>, 498 U.S. 39.

Viewed as a whole, the reasonable doubt instruction lessened the burden of proof,

failed to convey the strict reasonable doubt standard, failed to convey that the jury must

acquit Silva if they have a reasonable doubt, and violated Silva's rights to due process, a

jury trial, and a fair trial pursuant to the 5th, 6th, and 14th Amendments.  See <u>Cage</u>, 498 U.S.

at 41; <u>Francis</u>, 471 U.S. 307 (1985); <u>Gilday v. Callahan</u>, 59 F.3d 257, 264 (1st Cir. 1995).

Here, the instruction could have led the jury to convict with less than proof beyond

a reasonable doubt. The erroneous and incomplete reasonable doubt instruction was highly

prejudicial to Silva's rights to due process and a fair trial pursuant to the 5th, 6th, and 14th

Amendments.  See <u>Cage</u>, 498 U.S. 39, 41 (1990); <u>Francis</u>, 471 U.S. 307 (1985); <u>Gilday v.</u>

<u>Callahan</u>, 59 F.3d 257, 264 (1st Cir. 1995).

Since the trial judge failed to instruct the jury on reasonable doubt using the model

instruction and instead provided an instruction that both lessened and shifted the burden of

proof, this was a federal constitutional error.  Silva's 5th, 6th and 14th Amendment rights to

due process and a fair trial were violated and his conviction must be reversed. <u>Sullivan v.</u>

<u>California</u>, 508 U.S. 275, 280 (1993) (an erroneous reasonable doubt instruction is never

harmless beyond a reasonable doubt since it "vitiates all the jury's findings"); <u>Mullaney v. Wilbur</u>, 421 U.S. 684 (1975).  Given the importance of the reasonable doubt instruction to the administration of justice, the preserved federal constitutional error constitutes a structural error and warrants reversal. See <u>Sullivan v. Louisiana</u>, 113 S. Ct. 2078, 2082-2083 (1993).

In addition, this erroneous instruction actually prejudiced Mr. Silva, lessened the burden of proof, and – even if evaluated in the context of other instructions - is not harmless beyond a reasonable doubt. <u>Chapman v. California,</u> 386 U.S. 18 (1967).  Here, the instructions suggested to the jury that they needed to find a higher degree of <u>doubt</u> in order to find Silva not guilty.  Instead of making one mistake in an otherwise correct instruction, here the judge repeatedly lessened the burden of proof. In such a close case, where the alleged firearm was found on the ground on a public street, where the firearm was never observed in Silva's possession, where Silva's prints were not on the firearm, and where inconsistent police testimony suggested only that Silva may have bent down near where the firearm was found, it cannot be said that Silva would have been convicted with a correct instruction. <u>Francis</u>, 471 U.S. 307 (1985).  Based on the judge's reasonable doubt instruction, as well as the cumulative effect of other claimed errors, there is a reasonable likelihood that the jury may have understood the instructions to allow conviction on proof insufficient to meet the standards of due process. See <u>Winship</u>, 397 U.S. 358 (1970).

The Massachusetts Appeals Court described this instruction as "not optimal" but declined to reverse the convictions.  <u>Commonwealth v. Edson Silva</u>, 84 Mass. App. Ct. 1125; 999 N.E.2d 503; 2013 Mass. App. Unpub. LEXIS 1207 (2013).  Both the trial judge and the Massachusetts appellate courts failed to remedy this federal constitutional error, relying only on Massachusetts state law holdings that state that no specific language is

required.  But even if no specific language is required, the reasonable doubt instruction must withstand federal constitutional scrutiny.  Here, it does not. See In re Winship, 397 U.S. 358; Dunn v. Perrin, 570 F.2d 21 (1st. Cir. 1978).   By failing to remedy or even recognize the serious nature of the error, the Massachusetts state court decisions are contrary to and an unreasonable application of clearly established Supreme Court law. United States v. Gaudin, 515 U.S. 506 (1995); Victor v. Nebraska, 511 U.S. 1 (1994); Sullivan v. Louisiana, 508 U.S. 275 (1993).

For these reasons, this Court should grant habeas relief and vacate Silva's convictions.  Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979).

**5.    THE APPEALS COURT ERRED AS A MATTER OF CLEARLY ESTABLISHED SUPREME COURT LAW BY FAILING TO RECOGNIZE ERROR BY THE SUBSTITUTE EXPERT TESTIMONY FROM A REVIEWER WHO DID NOT DO THE ACTUAL TESTING, IN VIOLATION OF SILVA'S 5TH, 6TH AND 14TH AMENDMENT RIGHTS TO CONFRONT WITNESSES AND TO DUE PROCESS.**

As explained by clearly established Supreme Court precedent, the Sixth Amendment guarantees a defendant the right to confront witnesses who offer testimony against him; thus, out-of-court statements by witnesses that are testimonial are barred unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.  Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310 (2009); Crawford v. Washington, 541 U.S. 36 (2004); Bullcoming v. New Mexico, 131 S.Ct. 2705, 2713 (2011).

In this case, the Commonwealth notified defense counsel the afternoon before the trial commenced that the latent print expert listed on the witness list was no longer available to testify, and that the reviewing expert would be testifying as a surprise

substitute witness.   (I-17).   The latent print report submitted by the Commonwealth indicated that the unavailable expert was the senior criminalist who submitted the report and the testifying expert merely reviewed the report.   (I-22).   This surprise substitute fingerprint examiner Rachel Lemery reviewed the work of another examiner who reviewed a digital image, and then Lemery erroneously told the jury that the unavailable examiner reached the same conclusion that she reached. (I-22; II-29-30).

Silva filed a motion in limine to exclude the testimony of Lemery, who acted as the substitute fingerprint witness. (I-17). Silva also orally objected to this testimony on the first day of trial, and the objection included several supporting reasons for exclusion, one of which was Silva's right to confront witnesses. (I-17, 18).[8] Silva also argued the Commonwealth had not provided any discovery as to how Lemery "supervised" the examiner who did the actual testing, and the Commonwealth had not told Silva about this substitute witness until the day before trial. (I-17).  Silva renewed his objection during trial before the witness took the stand. (II-17). Silva again preserved his objection at sidebar during the testimony of this substitute witness. (II-28: "I'm preserving my other objection.").    Over Silva's objections, the judge admitted the testimony without confrontation of the original examiner. (II-29).

The admission of this testimony was constitutional error which violated Silva's 5th, 6th, and 14th Amendment rights to confront witnesses, to due process, and to a fair trial. Williams v. Illinois, 132 S.Ct. 2221 (2012); Bullcoming v. New Mexico, 131 S.Ct. 2705, 2713 (2011); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009); Crawford v. Washington, 541 U.S. 36 (2004).  See also Francis v. Franklin, 471 U.S. 307 (1985).  Not

---

[8] "[M]y first objection is under Melendez Diaz, if this witness did not do the actual testing, that they should not then be allowed to testify.  It violates Silva's right to confront and cross-examine the witness.".  I-17,18.

only did the substitute expert's testimony as a whole violate Silva's confrontation rights because she merely reviewed the work of the expert, it was also error for her to testify as to the conclusions drawn by the absent expert. The expert testified that the absent criminalist reached the same conclusions as she did, finding there was insufficient ridge detail to make a fingerprint comparison. (II-30). This testimony violated Silva's 5th, 6th and 14th Amendment rights because expert witnesses are not permitted to discuss other's testimonial statements that are not otherwise admitted into evidence without violating the defendant's confrontation rights.  Williams v. Illinois, 132 S.Ct. 2221 (2012).

Silva was prejudiced by this erroneous admission of evidence because the fact that two experts allegedly came to the same conclusion strengthened the expert's testimony relating to the fingerprint.  Although Lemery testified she was not able to identify a suspect based on the fingerprint found on the firearm, the prosecutor's closing argument implicitly asked the jury to infer that the print was Silva's but that there simply was not enough evidence for a match.  (II-77).  The Commonwealth used the absent examiner's results to bolster its case and the credibility of Lemery.   Given the manner in which the Commonwealth used the testimony, as well as the fact that this was a close case where Silva was never actually seen possessing the firearm and instead it was found on a crime-ridden street, this error was not harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18 (1967).

The Massachusetts Appeals Court failed to analyze this federal constitutional claim.  As such, de novo review is appropriate. Harrington v. Richter, 131 S.Ct. 770 (2011); Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).   However, even adjudication on the merits is presumed, the Massachusetts Appeals Court decision is contrary to – and an unreasonable application of – clearly established United States Supreme Court

precedent.  See <u>Williams v. Illinois</u>, 132 S.Ct. 2221 (2012); <u>Melendez-Diaz</u>, 557 U.S. at

310; <u>Crawford</u>, 541 U.S. 36.  A substitute witness may not testify to the results of another

non-testifying person's work without confrontation of the person who did the work.  See

<u>Williams v. Illinois</u>, 132 S.Ct. 2221 (2012); <u>Melendez-Diaz</u>, 557 U.S. at 310

Under any standard of review, the erroneous substitute witness testimony without

confrontation greatly prejudiced Mr. Silva, and under any standard of review reversal is required.

See <u>Melendez-Diaz</u>, 557 U.S. at 310; <u>Crawford</u>, 541 U.S. 36.

### 6. THE PROSECUTOR'S IMPROPER ARGUMENTS VIOLATED SILVA'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION.

The Appeals Court decision was contrary to and an unreasonable application of

clearly established Supreme Court precedent, because a prosecutor's closing argument may

not interfere with a defendant's constitutional rights to due process, to be presumed

innocent, or to a fair trial.  <u>Francis v. Franklin</u>, 471 U.S. 307 (1985); <u>Winship</u>, 397 U.S. at

364; <u>U.S. v. Mejia-Lozano</u>, 829 F.3d 268 (1st Cir. 1987); <u>Commonwealth v. Habarek</u>, 402

Mass. 105, 111 (1988), citing <u>U.S. v. Skandier</u>, 758 F.2d 43, 45 (1st Cir. 1985).

In this case, following the Commonwealth's opening and closing arguments,

counsel moved for a mistrial, or in the alternative asked for a limiting instruction, due to

prosecutorial misconduct. (II-79-80).  The errors in the prosecutor's opening and closing

arguments could have improperly influenced the jury to convict, especially where the trial

judge did not inform the jury that arguments of counsel were not evidence, and thus

violated Silva's rights to due process and a fair trial pursuant to the 5th, 6th and 14th

Amendments. <u>Francis v. Franklin</u>, 471 U.S. 307 (1985); <u>Greenberg v. U.S.</u>, 280 F.2d 472,

475 (1st Cir. 1960).

A. **The Prosecutor's Opening Argument Improperly Claimed Facts Not In Evidence When She Told the Jury That Silva Put the Gun In The Snow Ten Minutes Before It Was Found.**

In this case, the prosecutor stated that the firearm was placed in the snow ten minutes before the officers found the firearm on top of a snow bank.  (I-69).  This was not supported by the evidence, nor could the prosecutor have a good faith basis to believe she could prove this claim.  The prosecutor had no way of knowing when the firearm was placed in the snow under the vehicle where it was eventually found, and she also knew the testifying officers did not know when the gun was placed in the snow.

While the trial judge could have attempted to alleviate the prosecutor's misstatement, she declined to provide a curative instruction or strike the statement. (I-71).  Additionally, Silva was prejudiced because the judge never instructed the jury that arguments of counsel are not evidence, and in such a close case the prosecutor's false statement could have tipped the scales. This misstatement was not supported by any real evidence and violated Silva's rights to due process and a fair trial pursuant to the 5th, 6th and 14th Amendments. U.S. v. Griffin, 380 U.S. 609, 613 (1965); U.S. v. Mejia-Lozano, 829 F.3d 268 (1st Cir. 1987).

B. **The Prosecutor's Closing Argument Was Improper Because She Referred to the Defense Case as Junk and a Distraction.**

During closing arguments, a prosecutor may not disparage the defense or express a personal opinion about the strength of the evidence developed at trial.  See Greenberg, 280 F.2d at 475; Herring v. NY, 422 U.S. 853, 862 (1975).

In this case, the prosecutor repeatedly analogized the defense arguments to a "junk drawer" and referred to the defense mounted by Silva as a distraction multiple times during her closing argument.  (II-74-79).  These comments crossed the line from permissible

inferences to personal opinions on the strength of the evidence presented by the Commonwealth and the defense mounted by Silva.  See Greenberg, 280 F.2d at 475; Herring, 422 U.S. at 862.

Not only did the prosecution make impermissible comments during her closing, but also the trial judge failed to provide any curative instruction when requested by defense counsel.  (II-80).  Furthermore, not once during the two-day trial did the trial judge inform the jury that arguments made by counsel were not evidence, which could have helped mitigate the harm caused by the inappropriate comments made by the prosecution.

The comments made by the prosecutor shifted the burden of proof, violating Silva's rights to due process and a fair trial under the 5th, 6th and 14th Amendments.  See Francis v. Franklin, 471 U.S. 307 (1985); Greenberg v. U.S., 280 F.2d 472, 475 (1st Cir. 1960).

**C.  The Prosecutor's Closing Argument Was Improper Because She Asked The Jury to Infer that Silva's Fingerprints Were On the Gun Despite The Fact That The Crime Laboratory Witness Indicated There Was Insufficient Ridge Detail to Make Any Such Comparison.**

A prosecutor may not misstate the evidence or draw inferences that are not supported in the record. U.S. v. Manning, 23 F.3d 570, 572 (1st Cir. 1994)(improper for prosecutor to insinuate partial prints were inculpatory); Greenberg v. U.S., 280 F.2d 472, 475 (1st Cir. 1960); U.S. v. Nelson-Rodriquez, 319 F.3d 12 (1st Cir. 2003).

Here, the prosecutor asked the jury to infer that Silva's prints were on the firearm despite the fact that the fingerprint expert testified there was insufficient ridge detail to make a comparison.  (II-29, 77).  Defense counsel stated in her closing, "You heard testimony that there's a print on that gun.  It's not Mr. Silva's print…And there's no print from Silva on that gun." (II-69).  The prosecutor then stated in her closing, "You also heard about fingerprints on that firearm.  Now, defense counsel told you that there were no

prints.  I would offer to you that there were, and you heard testimony from both Kevin Kosiorek and Rachel Lemery that there was a print on that gun…The fingerprint lab was not willing to say that there was enough to make a comparison to the defendant.  And I'd ask that you take that for what it is.  If they don't have enough, they don't have enough.  But there was a print on that gun, make no mistake about it."  (2-77).

The prosecutor's argument asked the jury to draw an impermissible inference because it was directly contradicted by the fingerprint expert who testified no comparison could be made.  Greenberg, 280 F.2d at 475.  This misstatement of the evidence was not cured because the trial judge refused to provide an instruction or declare a mistrial when requested by defense counsel.  (II-79).  Additionally, the trial judge never instructed the jury that arguments of counsel were not evidence.

The inferences the prosecutor asked the jury to make that were not supported by the evidence and violated Silva's rights to due process and a fair trial under the 5th, 6th and 14th Amendments.  See Francis v. Franklin, 471 U.S. 307 (1985);  Greenberg v. U.S., 280 F.2d 472, 475 (1st Cir. 1960).  Again, in such a close case with no actual evidence that Silva possessed the gun in question, this misstatement went to the heart of the case and prejudiced Silva.  Because the error occurred during the prosecutor's closing argument, Silva had no opportunity to correct the error in front of the jury.  It cannot be said that the verdict would be the same absent the prosecutor's improper comments.  As such, a new trial is necessary. See Francis v. Franklin, 471 U.S. 307 (1985).

The cumulative arguments by the prosecutor during her opening and closing arguments violated Silva's federal constitutional rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments.  See Winship, 397 U.S. at 364; U.S. v.

Mejia-Lozano, 829 F.3d 268 (1ˢᵗ Cir. 1987); Commonwealth v. Habarek, 402 Mass. 105, 111 (1988), citing U.S. v. Skandier, 758 F.2d 43, 45 (1st Cir. 1985).

The Appeals Court decision unreasonably applied Supreme Court precedent to the facts of this case, allowing the prosecutor's constitutional violations to go uncorrected. See Francis v. Franklin, 471 U.S. 307 (1985); Greenberg v. U.S., 280 F.2d 472, 475 (1st Cir. 1960). This Court should vacate Silva's convictions.

**7. THE APPEALS COURT DECISION WAS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT PRECEDENT WHERE THE JUDGE REFUSED TO GIVE ADDITIONAL JURY INSTRUCTIONS THAT WERE WARRANTED AND SUPPORTED SILVA'S DEFENSE IN VIOLATION OF SILVA'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL PURSUANT TO THE 5ᵀᴴ, 6ᵀᴴ, AND 14ᵀᴴ AMENDMENTS.**

**A. The Mere Knowledge And Presence Instruction Supported Silva's Defense.**

All defendants have a federal constitutional right to due process and to a fair trial and to present a complete defense pursuant to the 5ᵗʰ, 6ᵗʰ, and 14ᵗʰ Amendments. Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006). Likewise, all defendants have a federal constitutional right to due process, and that right includes complete and correct jury instructions that accurately convey the prosecutor's burden of proving a crime in light of a particular set of facts. Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979). Consistent with these constitutional rights, a defendant is entitled to an instruction as to any defense for which there exists evidence sufficient for a reasonable jury to find in his favor. Mathews v. United States, 485 U.S. 58 (1988); Stevenson v. United States, 162 U. S. 313 (1896).

A jury instruction is warranted on a specific theory of defense if the evidence adduced at trial, taken in the light most flattering to the accused, plausibly supports the theory. United States v. Gamache, 156 F.3d 1, 9 (1st Cir.1998); United States v.

57

Rodriguez, 858 F.2d 809, 812 (1st Cir.1988).  The failure to properly instruct the jury on the applicable law is a "practice that betrays a fundamental principle of justice [and that] offends the Due Process Clause."   Sanna v. Dipaolo, 265 F.3d 1 (1st Cir. 2001) (citing Cooper v. Oklahoma, 517 U.S. 348, 363-65 (1996).

In this case, Silva requested that the trial judge give the model instruction on mere knowledge and presence in the vicinity of a firearm.  Such an instruction supported Silva's defense theory that although he may have been present in an area near where a firearm was recovered, he did not personally possess it.  Based on the facts of the case, the jury could have conceivably found that Silva's companion possessed the firearm found on the ground or that an unknown person possessed the gun and threw it under the car before Silva and his companion walked by.

Silva requested that the judge instruct:  "I caution you to remember that merely being present **in the vicinity of a [firearm], even if one knows that it is there**, does not amount to possession."  See Model Jury Instruction 3.22.   See also Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979).

The judge erroneously declined to give the requested jury instruction.  Instead of providing the mere presence instruction set forth in model instruction for possession, the trial judge stated, "Now, with regard to presence in the vicinity of a crime, no one is guilty of a crime merely because they are present in the vicinity of a crime, and you should always keep that in mind." (II-96).  That instruction omitted the clause that being in the vicinity of a firearm is insufficient to prove possession even if one knows the firearm is there.  The instruction also omitted that being in the immediate presence of a firearm is insufficient to prove possession.  Merely because Silva was arrested near a weapon it does not follow that he was in possession of that weapon.

58

The judge's incomplete jury instructions deprived Silva of a defense and violated Silva's rights to due process and a fair trial under the 5th, 6th and 14th Amendments.  Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979).  The Appeals Court did not make any findings on this issue, and the decision was contrary to clearly established Supreme Court precedent.  Mathews v. United States, 485 U.S. 58 (1988).

> **B.  The Appeals Court Erred By Failing To Grant Relief From The Trial Judge's Refusal to Give An Instruction That Jurors Should Consider With Caution Claims By Police Officers Related To Unrecorded Statements Attributed To Defendants**

A defendant is entitled to an instruction as to any defense for which there exists evidence sufficient for a reasonable jury to find in his favor.  Mathews v. United States, 485 U.S. 58 (1988); Stevenson v. United States, 162 U. S. 313 (1896).  Additionally, under Massachusetts law, where statements made by a defendant during an unrecorded custodial interrogation are admitted into evidence at trial, the defendant is entitled to a jury instruction concerning the need for the jury to evaluate the alleged statement with great caution.  Com. v. DiGiambattista, 442 Mass. 423, 424-25 (2004).  The use of this jury instruction must comport with due process and equal protection.  Evitts v. Lucey, 469 U.S. 387, 393 (1985).

Here, Officer Phillips alleged that when the arresting officer indicated Silva was being charged with possession of a firearm, Silva allegedly stated, "how are you going to charge me with possession, you didn't see me throw it." (I-233).  The police did not record that statement.  As such, the jury should have been advised that they should view the alleged statement with caution since there was no way to know what actual statements were made by the officers in order to provoke this statement.

When defense counsel asked for such an instruction, the court stated that there was no testimony concerning any recordings in this case so she would not provide an instruction concerning recordings.  Defense counsel reiterated that the purpose of requested instruction was to caution against unrecorded statements, however the Court disagreed. (II-55). The court's failure to provide the requested instruction deprived Silva of a defense and violated his rights to a fair trial and due process under the 5th, 6th and 14th Amendments. Holmes v. South Carolina, 547 U.S. 319 (2006); Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979).  The Appeals Court failed to analyze this issue, and this Court should review it de novo and reverse Silva's convictions. DiBenedetto v. Hall, 272 F.3d 1, 7 (1st Cir. 2001).

**8.  THE APPEALS COURT ERRED IN FAILING TO GRANT RELIEF AFTER OFFICER MCCORMACK GAVE AN IMPROPER SPECULATIVE OPINION THAT THE JUDGE HAD ALREADY RULED WAS INADMISSIBLE, IN VIOLATION OF SILVA'S 5TH, 6TH, AND 14TH AMENDMENT RIGHTS TO DUE PROCESS AND A FAIR TRIAL.**

A witness may not testify to his opinion on the ultimate issue in a case or offer an opinion as to the defendant's guilt. U.S. v. Meises, 645 F.3d 5, 13 (1st Cir. 2011) ("when a witness testifies to opinions based on evidence…is compounded when the witness is government agent whose testimony…is effectively a judgment on the question of guilt or innocence.").  To do so would intrude impermissibly upon the jury's fact-finding function. Id.

Here, the trial judge erred in refusing to grant a mistrial when Officer McCormack testified "It looked like [Silva] placed something."  The judge allowed Silva's Motion in Limine seeking to preclude the Commonwealth from offering any evidence that Silva placed a gun in the snow and ordered the prosecutor to notify the officer in advance that he

was not permitted to make any such statements. The officer's testimony was impermissible opinion testimony in violation of Silva's rights to due process and a fair trial. <u>U.S. v. Meises</u>, 645 F.3d 5, 13 (1st Cir. 2011).

Specifically, Silva filed a Motion in Limine prior to trial seeking to exclude any testimony or speculation as to what Silva was doing when he allegedly bent down.  (I-9).  Specifically, Silva sought to prevent Officer McCormack, the officer who encountered Silva on the night of the incident, from testifying that when he allegedly saw Silva bend over, his actions were consistent with disposing contraband or weapons, which was the ultimate issue for the jury to decide.  (I-10).  The trial judge <u>allowed</u> the motion and ordered the prosecutor to notify the officer in advance that he would not be permitted to testify that Silva bending down was consistent with anything or to offer any opinion.  (I-11).

Despite the court's order – which was allowed and therefore impacted Silva's opening statement and trial strategy - during trial Officer McCormack testified that Silva bent down and "looked like he placed something." (I-90).  In addition to violating the pretrial order, this was impermissible opinion testimony as to the defendant's guilt because the ultimate issue in the case was whether Silva in fact placed a gun on the snow bank. This determination was to be made by the jury and it was impermissible for Officer McCormack to express his opinion or to speculate on this issue.  Such testimony amounted to little more than vouching for the Commonwealth's position that Silva dropped the firearm that was later recovered by the officers, where Officer McCormack did not actually see Silva drop anything.

Defense counsel immediately objected to the impermissible opinion testimony and the prosecutor denied that Officer McCormack made any such statement.  (I-90-91).  The

judge then provided a vague instruction that the jury should disregard any "conclusions" made by witnesses.  (I-91).  Defense counsel then objected to the insufficient instruction and asked for a specific instruction that the jury disregard any testimony about Silva attempting to place anything on the ground.  (I-92).  The judge then provided an additional vague instruction that the jury should disregard any conclusion regarding when Silva bent down and told them to make their own inferences. (I-92). This instruction was not specific enough because while the judge advised the jury to disregard any "conclusions" there is no way to know exactly what the jurors considered a conclusion.  The judge should have specifically instructed the jury to completely disregard the officer's statement that "it looked like he placed something…" in order to ensure the jurors knew which statement they were being instructed to disregard.

　　　While the judge provided a vague instruction in an attempt to mitigate the prejudice of the inadmissible evidence, the instruction was not sufficient. (I-91). The trial judge never specifically told the jury that they should completely disregard any comments made by the officer indicating that it appeared Silva was placing something on the ground, but rather made a sweeping instruction that the jury should disregard any conclusions.  (I-92). This was error and did not mitigate the harm caused by the inadmissible opinion testimony. The officer's testimony was prejudicial error in violation of Silva's 5th, 6th and 14th Amendment rights to due process and a fair trial.  Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979).  The Appeals Court failed to analyze this issue, and this Court should review it de novo and reverse Silva's convictions. DiBenedetto v. Hall, 272 F.3d 1, 7 (1st Cir. 2001).

**9.   THE APPEALS COURT ERRED IN FAILING TO GRANT RELIEF AFTER THE CLERK ERRONEOUSLY READ THE WRONG CHARGE TO THE JURY INDICATING THAT SILVA WAS CHARGED WITH A LARGE CAPACITY FIREARM IN VIOLATION OF SILVA'S 5TH, 6TH AND 14TH AMENDMENT RIGHTS TO DUE PROCESS AND A FAIR TRIAL.**

Here, at the commencement of jury empanelment, the clerk read charges that were dismissed prior to trial, including the charge of possession of a large capacity weapon. (I-53).  As a result, defense counsel requested a mistrial, which was denied.  (I-59-60).  Instead, the judge merely re-read the charges then highlighted the error by stating, "I think you heard something about a large capacity. That is not a part of this case.  So please disregard any such statement." (I-60-61). The judge never instructed the jury that the charge of a large capacity firearm was a mistake and never told the jurors not to use the mistake in their deliberations or in reaching their decision.  This left the jury to speculate that the charge was part of another case against Silva, thereby prejudicing him and violating his right to due process and a fair trial under the 5th, 6th and 14th Amendments.  See U.S. v. Olano, 507 U.S. 25 (1993).  The Appeals Court failed to analyze this issue, and this Court should review it de novo and reverse Silva's convictions.  DiBenedetto v. Hall, 272 F.3d 1, 7 (1st Cir. 2001).

**10.  THE APPEALS COURT DECISION WAS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT PRECEDENT REGARDING THE TRIAL JUDGE ALLOWING THE OFFICER TO TESTIFY THAT HE KNEW SILVA FROM PAST INTERACTIONS ON TWO SEPARATE OCCASIONS IN VIOLATION OF SILVA'S 5TH, 6TH AND 14TH AMENDMENTS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.**

All defendants must be afforded an un-perturbed presumption of innocence, the enforcement of which "lies at the foundation of the administration of our criminal law." Coffin v. U.S., 156 U. S. 432, 453 (1895). In order to make sure that the presumption of innocence is not weakened or perturbed, all courts must be alert to any factors that might

undermine the fairness of a trial.  In re Winship, 397 U.S. 358, 364 (1970); Estelle v. Williams, 425 U.S. 501 (1976)(A state cannot compel a defendant to stand trial in identifiable prison or jail clothing over his objection).

Here, Officer McCormack testified on two separate occasions that he knew Silva. (I-151, 152).  He also indicated that when he approached Silva he "asked him the regular questions" and testified that Silva "knows what a FIO form is," implying that Silva had engaged in criminal activity in the past.  (I-151).  This evidence was presented despite the fact that Silva filed a motion in limine prior to trial, which was allowed by the trial court, requesting that the Court order the Commonwealth's witnesses to refrain from making any statements before the jury that would suggest that Silva was known to the police.

In a close case where there was no direct evidence linking Silva to the firearm, there was a grave risk the jury could have been influenced by the officer's prior acquaintance with Silva.  The jury could have used this evidence to impermissibly infer that Silva had engaged in bad acts in the past and therefore must be guilty of possessing a firearm – instead of focusing on whether there was proof beyond a reasonable doubt. Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979).

Although the trial judge told the jury to disregard the statements after the officer twice stated he knew Silva previously, a further instruction or a mistrial was warranted in this instance where the testimony was highly prejudicial to Silva.  The officer's testimony was prejudicial error in violation of Silva's 5th, 6th and 14th Amendment rights to due process and a fair trial.  Francis v. Franklin, 471 U.S. 307 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979); Illinois v. Allen, 397 U.S. 337 (1970).

### 11. SILVA WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL PURSUANT TO THE 5TH, 6TH AND 14TH AMENDMENTS BY THE CUMULATIVE IMPACT OF ALL THE ERRORS.

It is clearly established by the United States Supreme Court that "[a] defendant in a criminal case has a right to be tried according to the substantive and procedural due process requirements of the 14th Amendment." Rogers v. Richmond, 365 U.S. 532, 544-45 (1961).  Likewise, it is clearly established that "The Constitution guarantees a fair trial through Due Process Clauses." U.S. v. Olano, 507 U.S. 25, 28 (1993).  A violation of the federal right to due process can arise from a combination of circumstances or pieces of evidence that, individually, may not be violative of due process. United States v. Sampson, 335 F.Supp.2d 166, 183 (D.Mass. 2004); Matlock v. Rose, 731 F.2d 1236, 1244 (6th Cir. 1984).

In this case, the cumulative impact of all of the errors at Silva's trial deprived him of his rights to due process and a fair trial pursuant to the 5th, 6th, and 14th Amendments to the U.S. Constitution.  See Olano, 507 U.S. 25, 28 (1993).  This was a close case where Silva's fingerprints were not on the gun, he was never seen possessing the gun, the police did not see him drop anything, and the only evidence was that Silva may have leaned down near a car where the gun was later found on the ground on a public street in a high crime area.  This is also a case where Edson Silva has maintained his actual innocence throughout the proceedings and he reasserts his innocence here.  The combination of the judge's inadequate jury instructions, her refusal to give additional instructions, her actions in preventing Silva from presenting evidence to support his defense, and the prosecutor's improper closing argument all resulted in an unfair trial devoid of due process.  If none of the errors occurred, it is possible that the result would be different.  Since cumulative error resulted in a due process violation, this Court should vacate Silva's convictions.

**12. THE TRIAL JUDGE ERRED IN DENYING SILVA'S MOTION TO SUPPRESS EVIDENCE AND MOTION TO EXCLUDE STATEMENTS, WHERE THE WARRANTLESS POLICE ACTIONS VIOLATED SILVA'S 4TH, 5TH, 6TH AND 14TH AMENDMENT RIGHTS.**

Silva asserts that the warrantless police stop and seizure of his person, the acquisition of his identity, and the continued detention of his person (after police had searched Silva's person and found nothing and decided to search the surrounding street for contraband to use against Silva) all violated his rights under the Fourth Amendment. Arizona v. Johnson, 555 U.S. 323 (2009); Arizona v. Gant, 556 U.S. 332 (2009); Muehler v. Mena, 544 U. S. 93, 100–101 (2005).

Silva acknowledges that ordinarily a habeas court will not consider 4th Amendment suppression claims raised within a habeas petition.  See Stone v. Powell, 428 U.S. 465 (1976). However, Silva objects to that holding, he objects to any limitations on this Court's authority to correct constitutional errors, and he raises the claim herein because there was a federal constitutional violation.  Silva also raises the claim herein to avoid any future claims by prosecutors that Silva somehow waived this issue by not raising it at every opportunity.

As the recent and tragic shootings of young African-American men by police officers reveals, there is a serious problem in America with the way that police officers interact with dark-skinned youth who are going about their business on our public streets.

In this case, the Massachusetts Appeals Court unreasonably applied clearly established Supreme Court precedent to the facts of this case.  The arresting officers' alleged observations of two unknown black males lawfully walking down a street, and one young black man bending down beside a car, were insufficient to justify the stop and seizure and search and continued detention while police searched the street. Arizona v.

Johnson, 555 U.S. 323 (2009); Arizona v. Gant, 556 U.S. 332 (2009); Muehler v. Mena, 544 U. S. 93, 100–101 (2005); Terry v. Ohio, 392 U.S. 1 (1968).  The officers lacked a reasonable and articulable suspicion that Silva had committed or was committing any crime prior to the stop and seizure.  U.S. v. Sokolow, 490 U.S. 1, 7 (1989) (requiring specific and articulable facts to support reasonable suspicion).

As to the specific evidence relating to the motion to suppress, a motion hearing on the Mr. Silva's motion to suppress was held on December 21, 2009.  At the hearing, arresting Officer McCormack testified that he was on routine patrol at night in Roxbury when he saw two men walking down the middle of the street towards the direction that the police were driving from.  (MTS- 8). Officer McCormack did not recognize either of these two men.  (MTS-13).  It was a winter night and the reasonable presumption was that the two people were walking in the street because the sidewalks were covered with snow and ice.  (MTS-12).   Officer McCormack acknowledged that it is not a crime to walk in the middle of the street, and that is not a crime to walk over to the sidewalk when a car is coming down the street.  (MTS-13).

Officer McCormack testified that as he was driving his police vehicle down the street towards the men, one of the men walked back from the middle of the street to the sidewalk.  (MTS-8). Officer McCormack stated that this behavior was not unusual, and acknowledged that he would expect someone to walk over to the sidewalk to avoid getting struck by the oncoming car.

Upon seeing the unidentified man walk to the sidewalk, Officer McCormack immediately stopped his police cruiser and exited the vehicle. (MTS-15). McCormack's partner also got out of the car, and they called for backup.  (MTS-18). McCormack physically detained both men.  (MTS-18). McCormack later stated, "I told you that right

off the bat until I FIO'd him, he's not free to leave.  I want to find out why he's in the area."  (MTS-22). Officer McCormack had not received any calls or complaints relating to suspects in the area carrying handguns, he was not responding to any crimes, and he had not received any informant information about anyone in the area. (MTS-29).

Officer McCormack further testified that while the unidentified man was on the sidewalk, he "bent down like he was placing something on the sidewalk and then he continued to walk towards us."  (MTS-9). McCormack testified that neither man was free to leave. (MTS-18).   McCormack did not see anything in the unidentified man's hand before he bent down, nor did he see the unidentified man place anything on the ground.. (MTS-15).   The unidentified man then continued walking on the sidewalk.  (MTS-17).  At no point did the unidentified man run or attempt to flee; instead he merely kept walking down the street.  (MTS-17).

The unidentified man provided his name, date of birth, and address to the police. Officers McCormack and Condon then kept Mr. Silva in custody while they searched the street and the ground underneath cars.   (MTS-22).   A firearm was later recovered underneath a car near where Mr. Silva allegedly bent down. (MTS-6). Mr. Silva's prints were not recovered from the firearm, nor was there any trace evidence connecting him to this crime. (See attached report).  Mr. Silva was handcuffed.  (MTS-10).

While Mr. Silva was in handcuffs, McCormack's partner Officer Condon asked Silva if he had a license to carry, even though Silva was under arrest and had not yet been advised of his Miranda rights.  (MTS-10). Mr. Silva allegedly told Officer Condon that he did not have a license to carry a firearm. (MTS-35). At some later point, Mr. Silva was advised of his Miranda rights by another officer, Officer McNeil.  (MTS-10).

Based on that testimony, the police lacked a constitutional reasonable suspicion to intrude upon Silva's 4th Amendment rights.  <u>Arizona v. Johnson</u>, 555 U.S. 323 (2009); <u>Arizona v. Gant</u>, 556 U.S. 332 (2009).  Moreover, any conceivable suspicion absolutely dissipated after the police frisked Silva's person and found nothing.  See <u>Muehler v. Mena</u>, 544 U. S. 93, 100–101 (2005).   Silva should have been free to leave.  Instead, police targeted Silva because he was black and detained him without a warrant until they found something on the street to charge him with.  Merely being young and black and bending over on a sidewalk in Dorchester does not create reasonable suspicion.  The trial judge erred in denying the Motion to Suppress and the subsequent Motion to Exclude Statements, and all fruits of the initial seizure should have been suppressed.  See <u>Terry</u>, 392 U.S. at 21; <u>Wong Sun v. U.S.</u>, 371 U.S. 471, 484-86 (1963).  After the unconstitutional police actions, the police obtained Silva's identity and obtained statements that were fruits of the warrantless police actions.  It cannot be said that the trial verdict would be the same absent the statements.

The warrantless police stop and seizure of Silva's person, the acquisition of his identity, and the continued detention of his person (after police had searched Silva's person and found nothing and decided to search the surrounding street for contraband to use against Silva) all violated his rights under the Fourth Amendment.  See <u>Arizona v. Johnson</u>, 555 U.S. 323 (2009); <u>Arizona v. Gant</u>, 556 U.S. 332 (2009); <u>Muehler v. Mena</u>, 544 U. S. 93, 100–101 (2005). As such, this Court should vacate the convictions.

## <u>CONCLUSION</u>

For all of the aforementioned reasons, this Honorable Court should vacate the convictions or conduct an evidentiary hearing, find that Silva's due process rights were violated, and grant Silva a new trial.

Respectfully Submitted,
EDSON SILVA,
By his attorney,


/s/ Rosemary Scapicchio
Rosemary Curran Scapicchio
107 Union Wharf
Boston, MA 02109
(617) 263-7400
BBO# 558312
scapicchio_attorney@yahoo.com


CERTIFICATE OF SERVICE


I hereby certify that a true copy of the above document was served upon the attorney of record for each party and upon any party appearing pro se by complying with this Court's directives on electronic filing.

Dated: ___March 5, 2015___   Signed: /s/ Rosemary Scapicchio