UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EDSON SILVA,                              *
                                         *
          Petitioner,                    *
                                         *
          v.                             *     Civil Action No. 15-cv-10681-ADB
                                         *
STEVEN W. TOMPKINS,                      *
                                         *
          Respondent.                    *
                                         *

**MEMORANDUM AND ORDER ON PETITION FOR A WRIT OF HABEAS CORPUS**

BURROUGHS, D.J.

On September 23, 2010, following a jury trial in Boston Municipal Court, Central

Division, Petitioner Edson Silva ("Silva") was convicted of unlawful possession of a loaded

firearm and ammunition without an FID card in violation of Mass. Gen. Laws ch. 269, §§ 10(a),

10(n), and 10(h) and of defacing a serial number in violation of Mass. Gen. Laws ch. 269, § 11C.

Silva was sentenced to three years in the House of Corrections, followed by probation.  Before

the Court is Silva's petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254

("Petition").  [ECF No. 1].  For the reasons stated herein, Silva's Petition is denied.

    **I.    FACTUAL AND PROCEDURAL BACKGROUND**

On January 17, 2009, at approximately 2:15 a.m., Boston Police officers Richard

McCormack and Michael Condon were on a routine patrol in a cruiser near the Uphams Corner

area of Boston when they saw two individuals in the street, walking towards them.

[Supplemental Answer ("S.A.") at 402–08].  According to one of the officers, one of the

individuals, Silva, left the middle of the street and moved onto the sidewalk.  [Id. at 408–09].

Officer McCormack testified that he then observed Silva bend down behind a car, extend his

arm, and then stand back up and continue to walk towards the officers.  [Id. at 409–11].  The

officer did not see anything in Silva's hand.  See [id. at 474–75].  Silva was detained by the

officers.  [Id. at 493].  Once additional units arrived, Officer McCormack walked to the location

where he had observed Silva bend down and extend his arm and retrieved a firearm.  [Id. at 423–

24, 508–09].  Officer Myron Phillips testified that when Silva was told that he was being charged

with illegal possession of a firearm, Silva stated "how are you going to charge me with

possession, you didn't see me throw it."  [Id. at 559].

Following his September 23, 2010 conviction on the four counts, Silva appealed to the

Massachusetts Appeals Court ("Appeals Court").  Commonwealth v. Silva, No. 13-P-24, 2013

WL 6633943, at *1 (Mass. App. Ct. Dec. 18, 2013).[1]  The Appeals Court agreed with Silva that

his conviction for unlawful possession of ammunition was a lesser-included offense (as conceded

by the Commonwealth) and reversed that conviction.  Id.  The Appeals Court then affirmed

Silva's three remaining convictions in an opinion that specifically rejected three of the other

arguments raised by Silva, and summarily rejected the remaining arguments.  See id. at *1–2 &

n.1.  The Appeals Court rejected Silva's arguments that (1) the trial court's instruction to the jury

regarding reasonable doubt was inadequate; (2) the prosecutor's closing argument was improper

when it analogized Silva's case to a "junk drawer" and a "distraction" and that (3) the trial judge

erred in denying his motion to suppress, finding that the police officers had a reasonable

suspicion to stop him.  Id.  The Appeals Court rejected Silva's remaining arguments in a

footnote, stating that "[t]o the extent that we do not address separately each of the defendant's

other contentions, 'they have not been overlooked. We find nothing in them that requires

---

[1] On habeas review, a "state court's factual findings are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence to the contrary."  Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002) (quoting Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002)). This presumption applies with equal force to factual findings made by state trial and appellate courts. Id.

discussion.'" <u>Id.</u> at *2 n.1 (quoting <u>Dep't of Rev. v. Ryan R.</u>, 816 N.E.2d 1020, 1027 (Mass. App. Ct. 2004)).

Silva then applied to the Massachusetts Supreme Judicial Court ("SJC") for further appellate review but, on February 28, 2014, the SJC declined to hear his appeal.  <u>Commonwealth v. Silva</u>, 6 N.E.3d 546 (Mass. Feb. 28, 2014) (table).  Silva did not seek certiorari to the U.S. Supreme Court and filed this Petition on March 5, 2015, more than ninety days after the SJC's denial of further review.  [ECF No. 1].

Silva's Petition initially raised twelve issues (some with subparts), including the three issues specifically discussed by the Appeals Court, as well as the nine additional issues upon which relief was summarily denied.  <u>See</u> [ECF No. 1-1].  On May 8, 2015, Steven W. Tomkins ("Respondent") filed his answer to the Petition and moved to dismiss, arguing that because certain issues were not exhausted in the Massachusetts state courts, the Petition should be dismissed in its entirety.  [ECF Nos. 9, 11, 12].  In response to this motion, Silva sought leave to voluntarily dismiss the three claims that Respondent asserted were not properly exhausted in the state courts.  [ECF No. 15].  This Court granted the motion, dismissed the three unexhausted claims, and allowed Petitioner to proceed on the remaining nine claims.[2]  [ECF No. 16].  On November 12, 2015, Respondent filed his Memorandum of Law in Opposition to the Petition. [ECF No. 20].  This opinion addresses the remaining claims raised by Silva.

_____

[2] Claims Nos. 5, 7(B), and 11 in Petitioner's Memorandum in Support of Petition for Relief were dismissed.

## II.  LEGAL STANDARD

### A.  The Antiterrorism and Effective Death Penalty Act of 1996[3]

A federal district court's review of a state criminal conviction is governed by the

Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA").  28 U.S.C. § 2254.  The

AEDPA permits federal courts to grant habeas relief after a final state adjudication of a federal

constitutional claim only if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State court
> proceeding.

28 U.S.C. § 2254(a), (d)(1)–(2).  A state court decision is "contrary to" clearly established

Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the

Supreme Court on a question of law or if the state court decides a case differently from a

decision of the Supreme Court on a materially indistinguishable set of facts.  Williams v. Taylor,

529 U.S. 362, 412–13 (2000).  A state court decision is considered an unreasonable application

of Supreme Court precedent if the state court identifies the correct legal rule but unreasonably

applies it to the facts.  Id. at 407.  An unreasonable application requires "some increment of

incorrectness beyond error."  Norton v. Spencer, 351 F.3d 1, 8 (1st Cir. 2003) (internal

quotations omitted).  A state court judgment is based on an unreasonable determination of the

---

[3] Silva argues that the AEDPA is unconstitutional because it "contravenes the Article III authority of federal district court judges," and asks this Court to review his claims de novo and to conduct a full evidentiary hearing.  [ECF No. 1-1 at 28].  This argument is foreclosed by First Circuit precedent.  See Evans v. Thompson, 518 F.3d 1, 10 (1st Cir. 2008) ("There is thus nothing inherently unconstitutional about Congress restricting the scope of relief available from lower federal courts on collateral review of state criminal convictions."); see also Herbert v. Dickhaut, No. 06-10036-NG, 2011 WL 3021770, at *14 (D. Mass. July 21, 2011) (recognizing that district court is bound by circuit precedent holding that the AEDPA is constitutional).

facts if the decision is "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  The petitioner carries the burden of proof.  Cullen v. Pinholster, 563 U.S. 170, 181 (2011).  In conducting a habeas review, a federal court is limited to deciding whether the conviction violated the Constitution, laws, or treaties of the United States.  Estelle v. McGuire, 502 U.S. 62, 67 (1991).  Furthermore, "[e]rrors based on violations of state law are not within the reach of federal habeas petitions unless there is a federal constitutional claim raised."  Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006).

A federal court cannot grant habeas relief to a state prisoner unless the prisoner has first exhausted his federal constitutional claims in state court.  28 U.S.C. § 2254(b)(1)(A).  "[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).  A claim for habeas relief is exhausted if it has been "fairly and recognizably" presented in state court.  Sanchez v. Roden, 753 F.3d 279, 294 (1st Cir. 2014) (quoting Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000)).  In other words, "a petitioner must have tendered his federal claim [in state court] in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question."  Id. (quotations and citations omitted).

"[A] state court decision that does not address the federal claim on the merits falls beyond the ambit of AEDPA.  When presented with such unadjudicated claims, the habeas court reviews them de novo."  Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).  However, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Harrington v. Richter, 562 U.S. 86, 99

(2011).  "Section 2254(d) applies even where there has been a summary denial."  <u>Cullen</u>, 563

U.S. at 187.

### B.      Standard of Review

Silva argues that this Court should review each of his habeas claims *de novo* because the

Appeals Court did not adjudicate his claims on the merits.  [ECF No. 1-1 at 16].  In general, as

Silva acknowledges, when a state court issues an order that summarily rejects without discussion

a habeas petitioner's claims, the reviewing habeas court is to presume (subject to rebuttal) that

the federal claim was adjudicated on the merits.  [<u>Id.</u> at 17].  Here, the Appeals Court discussed

three issues raised by Silva in its opinion, and rejected the remainder in a footnote, where it

stated that "[t]o the extent that we do not address separately each of the defendant's other

contentions, 'they have not been overlooked.  We find nothing in them that requires discussion.'"

<u>Silva</u>, 2013 WL 6633943, at *2 n.1 (quoting <u>Dep't of Rev. v. Ryan R.</u>, 816 N.E.2d 1020, 1027

(Mass. App. Ct. 2004)).  Because of the summary disposition of some of his arguments by the

Appeals Court, Silva argues that this Court should reject the presumption that all of his claims

were adjudicated on the merits.  [ECF No. 1-1 at 24].

In support of the argument that the Appeals Court did not render a judgment on the

merits, Silva cites <u>Johnson v. Williams</u>, 568 U.S. 289, 302 (2013), in which the Supreme Court

explained that a judgment is rendered on the merits if it was "delivered after the court . . . heard

<u>and evaluated</u> the evidence and <u>the parties' substantive arguments</u>."  [ECF No. 1-1 at 24–25

(emphasis in brief)].  Silva argues that there "has been no evaluation and analysis of [his] federal

constitutional claim because the Appeals Court expressly and deliberately chose not to even

discuss them."  [<u>Id.</u> at 25].

Silva underestimates the import of <u>Johnson</u> and other precedent, which explain the high bar that a petitioner must satisfy in order for a district court to review a habeas petition *de novo*. In <u>Johnson</u>, the Court explained that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." 568 U.S. at 301.  Here, the Appeals Court expressly addressed all of Silva's claims: its opinion discussed three of the claims in some detail and summarily rejected Silva's remaining arguments. <u>Silva</u>, 2013 WL 6633943, at *2 n.1.  Silva has offered no evidence suggesting that the Appeals Court did not address his claims on the merits.  Without making some showing that the Appeals Court did not adjudicate his claims on the merits, coupled with the fact that the Appeals Court addressed all of his arguments (even if summarily), Silva has not rebutted the presumption of adjudication on the merits.

Further, this is also not a case where the state court inadvertently overlooked a federal claim because the Appeals Court expressly denied the remaining claims and noted that they did not require discussion.  <u>See</u> <u>Johnson</u>, 568 U.S. at 303 (stating that "[w]hen the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge").

Supreme Court precedent also forecloses any argument that the summary disposition of certain issues by the Appeals Court does not qualify as a disposition on the merits.  <u>See, e.g.</u>, <u>Cullen</u>, 563 U.S. at 187 ("Section 2254(d) applies even where there has been a summary denial").  The Supreme Court in <u>Harrington v. Richter</u>, 562 U.S. 86 (2011), observed that § 2254(d), by its terms, "bars relitigation of any claim 'adjudicated on the merits' in state court,

7

subject only to the exceptions in §§ 2254(d)(1) and (2)" and does not expressly "requir[e] a statement of reasons."  562 U.S. at 98.  The <u>Harrington</u> Court added that "determining whether a state court's decisions resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning."  <u>Id.</u> "[Section] 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  <u>Id.</u> at 100.

This Court therefore rejects Silva's argument that the claims presented to the Appeals Court were not adjudicated on the merits.  Silva has not made the necessary showing to rebut the presumption of adjudication on the merits and further, the Appeals Court did actually address each of his claims.  Accordingly, Silva's Petition will not be reviewed *de novo* and to obtain relief, he must instead show that the state court's decision "was contrary to" "clearly established" federal law or that the state court's decision "involved an unreasonable application of such law." <u>Harrington</u>, 562 U.S. at 100.

## III.   DISCUSSION

### A.   Alleged Violation of Silva's Due Process and Fair Trial Rights Based on Prosecution's Failure to Plead and Prove Silva Lacked a License to Carry a Firearm

Silva argues that his due process and fair trial rights were violated by the prosecution's failure to prove beyond a reasonable doubt that he lacked a license to carry a firearm and further, that the burden of proof was improperly shifted onto him to show that he had a firearms license because "a lack of a license is a factual element of the offense of 'possession of a firearm without a license.'"  [ECF No. 1-1 at 31].  Silva further claims that requiring proof of a firearms license to be proven as an affirmative defense violates his due process rights as set forth in <u>In re Winship</u>, 397 U.S. 358 (1970), and that his conviction violates his fair trial and due process rights under <u>Alleyne v. United States</u>, 570 U.S. 99 (2013), because any fact that increases a

mandatory minimum sentence is an element that must be proven to a jury beyond a reasonable doubt.  [Id.].

Respondent answers that Silva's arguments are largely foreclosed by Powell v. Tompkins, 783 F.3d 332 (1st Cir. 2015).  [ECF No. 20 at 14].  In Powell, the defendant was convicted on state charges of unlawful possession of a loaded firearm, which was affirmed by the SJC.  783 F.3d at 334.  Powell unsuccessfully petitioned for habeas relief in federal court.  Id. Powell then argued to the First Circuit that "the state criminal procedure requirement that a defendant accused of unlawful possession of a firearm bear the burden of producing evidence of a proper license as an affirmative defense" violated his federal due process rights.  Id.  The First Circuit in Powell addressed whether "the state law prescription of licensure as an affirmative defense . . . accords with procedural due process under the Federal Constitution [or] is contrary to, or comprises an unreasonable application of, clearly established Supreme Court precedent." Id. at 341.  In rejecting Powell's due process argument, the First Circuit held that he failed to establish that the state court's decision conflicted with clearly established Supreme Court precedent and noted that Powell failed to cite "even a single roughly comparable federal case in which a state conviction secured under a statutory construct that is analogous to Massachusetts law was set aside as violating the Winship due process demands."  Id. at 335, 343.

Because Powell governs this case and there is no clearly established federal law to the contrary, the Court declines to find that Silva's due process rights were violated by a state law that provides that possession of a firearms license is an affirmative defense.  See id. at 337–43. As the Supreme Court has recognized, although "[s]tates must prove guilt beyond a reasonable doubt with respect to every element of the offense charged, [] they may place on defendants the burden of proving affirmative defenses."  Gilmore v. Taylor, 508 U.S. 333, 341 (1993).

The Court also rejects Silva's argument that he was deprived of his due process or fair trial rights under <u>Alleyne</u> by being required to prove that he had a firearms license.  <u>See</u> [ECF No. 1-1 at 31–33].  <u>Alleyne</u> held that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt."  570 U.S. at 103.  Silva's reliance on <u>Alleyne</u> is misplaced, however, because the fact of whether he had a firearm license is an element of an affirmative defense, not a fact that increases the mandatory minimum sentence.  <u>See</u> <u>United States v. Blake</u>, 858 F.3d 1134, 1137 (8th Cir. 2017) (rejecting argument under <u>Alleyne</u> that affirmative defense must be decided by a jury and proven beyond a reasonable doubt because the affirmative defense could not increase the defendant's penalty); <u>United States v. Zuniga</u>, 767 F.3d 712, 719 (7th Cir. 2014) (concluding that affirmative defense was not covered by <u>Alleyne</u> and thus did not require proof beyond a reasonable doubt).

The statutory scheme in Massachusetts demonstrates that the fact of licensure is an affirmative defense.  Section 7 of Chapter 278 provides that licensure must be proven by the defendant seeking to rely on that fact as a defense.  <u>See</u> Mass. Gen. Laws ch. 278, § 7 ("A defendant in a criminal prosecution, relying for his justification upon a license . . . shall prove the same; and, until so proved, the presumption shall be that he is not so authorized.").  The SJC interpreted Section 7 as applying to prosecutions under Mass. Gen. Laws ch. 269, § 10(a) in <u>Commonwealth v. Jones</u>, 361 N.E.2d 1308 (Mass. 1977), in which it held:

> We sum up the established interpretation of G.L. c. 278, s 7, as it applies to prosecutions under G.L. c. 269, s 10(a). The holding of a valid license brings the defendant within an exception to the general prohibition against carrying a firearm, and is an affirmative defense. . . . Absence of a license is not "an element of the crime," as that phrase is commonly used. In the absence of evidence with respect to a license, no issue is presented with respect to licensing. In other words, the burden is on the defendant to come forward with evidence of the defense. If such evidence is presented, however, the burden is on the prosecution to persuade the trier of facts beyond a reasonable doubt that the defense does not exist.

Jones, 361 N.E.2d at 1310–11 (internal citations omitted).  This Court is bound to follow the SJC's interpretation of Massachusetts statutes.  See Powell, 783 F.3d at 340.  Because licensure was a factual element of Silva's affirmative defense and not an element of the crime charged, Silva's lack of a license did not need to be proven beyond a reasonable doubt by the prosecution in order to support the conviction.

Accordingly, the Court finds that the Appeals Court's rejection of Silva's claims that his due process and fair trial rights were violated was not contrary to federal law established by In re Winship and Alleyne and also did not involve an unreasonable application of clearly established federal law.

### B.      Alleged Violation of Silva's Second Amendment Rights

Silva challenges his convictions as violative of the Second Amendment.  [ECF No. 1-1 at 35].  He argued to the Appeals Court that the Supreme Court's rulings in McDonald v. Chicago, 561 U.S. 572 (2010), and District of Columbia v. Heller, 554 U.S. 570 (2008), require that his convictions relating to the possession of a loaded firearm without a license be reversed.  [Id. at 35–36; S.A. at 57–58 ("This 'general prohibition' in Massachusetts [against carrying a firearm established by Mass. Gen. Laws ch. 269, §10] violates Silva's 2nd amendment right to keep and bear arms and as such, his firearms conviction must be vacated.")].  The Appeals Court summarily rejected this argument, Silva, 2013 WL 6633943, at *2 n.1, and this Court concludes that its decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law.

In Heller, the Supreme Court held that the District of Columbia's complete ban on handgun possession in the home violated the Second Amendment, as did its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense.

554 U.S. at 635.  In <u>McDonald</u>, the Court subsequently held that the Due Process Clause of the

Fourteenth Amendment, by incorporation, makes the Second Amendment binding on the States.

561 U.S. at 791.  <u>Heller</u>, however, also recognized that the right to bear arms "secured by the

Second Amendment is not unlimited," 554 U.S. at 626, and <u>McDonald</u> reaffirmed that "<u>Heller</u>,

while striking down a law that prohibited the possession of handguns in the home, recognized

that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in

any manner whatsoever and for whatever purpose.'"  561 U.S. at 786 (quoting <u>Heller</u>, 554 U.S.

at 626).

Silva argues that under the Second Amendment, "individuals are guaranteed the right to

possess and carry weapons in case of confrontation [and that] this right cannot be infringed upon

by the federal or state government."  [ECF No. 1-1 at 35].  Neither <u>Heller</u> nor <u>McDonald</u> went so

far with <u>Heller</u> holding only that "the District's ban on handgun possession in the home violates

the Second Amendment, as does its prohibition against rendering any lawful firearm in the home

operable for the purpose of immediate self-defense."  <u>Heller</u>, 554 U.S. at 635.  Thus, the

Supreme Court did not recognize a general, unlimited right to carry a firearm outside the home in

either case.

In considering <u>Heller</u> and <u>McDonald</u>, the First Circuit in <u>Powell</u> concluded that those

cases did not create an unfettered right to carry or possess a firearm:

> More fundamentally, given the public sphere context for his firearm possession,
> Powell provides us with no basis for concluding that his convictions could even
> reach the safe haven of the Second Amendment. He boldly—and wrongly—
> pronounces that the Supreme Court in <u>Heller</u> "clearly established that the right to
> keep and bear arms encompasses one's 'person' unrelated to the home." (Emphasis
> in original.) We flatly reject his read. Together, <u>Heller</u> and <u>McDonald</u> establish that
> states may not impose legislation that works a complete ban on the possession of
> operable handguns in the home by law-abiding, responsible citizens for use in
> immediate self-defense.

783 F.3d at 347.[4]

In summarily denying Silva's Second Amendment appeal, the Appeals Court acted reasonably and did not misapply any clearly established federal law.  While <u>Heller</u> and <u>McDonald</u> together hold that state firearms regulations are constrained by the Second Amendment, neither case requires a finding that the Massachusetts statutes challenged by Silva are unconstitutional.  Thus, Silva cannot not shown that the Appeals Court's decision was contrary to or an unreasonable application of clearly established federal law.

### C.   Alleged Violation of Silva's Due Process, Fair Trial, and Complete Defense Rights Based on Restrictions Imposed on Silva's Defense

Silva argues that the Appeals Court decision was contrary to clearly established Supreme Court precedent in failing to hold that certain of the trial court's rulings restricted Silva's defense and thereby violated his rights to due process, a fair trial, and to present a complete defense under the Fifth, Sixth, and Fourteenth Amendments.  [ECF No. 1-1 at 37].  Specifically, Silva contends that rulings by the trial court concerning a Computer Assisted Dispatch ("CAD") sheet and the defense's attempt to introduce evidence and testimony related to the arrival times of police officers to the scene violated Silva's clearly established constitutional rights under <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324–25 (2006), because they prevented him from presenting

---

[4] While not binding on this Court, the SJC has also considered the issue of whether state gun regulation statutes violate <u>Heller</u> and <u>McDonald</u> and has concluded that they do not.  In <u>Commonwealth v. Loadholt</u>, 954 N.E.2d 1128 (Mass. 2011), for example, the SJC affirmed the constitutionality of Mass. Gen. Laws ch. 269, § 10(h)(1), which makes it unlawful to possess a firearm without an FID card subsequent to <u>Heller</u> and <u>McDonald</u>.  954 N.E.2d 1128, 1130–31 (Mass. 2011).  In <u>Loadholt</u>, the SJC denied a facial challenge to Mass. Gen. Laws ch. 269, § 10(h)(1) and found that "the Court in <u>Heller</u> identified an individual right to carry and bear arms that is limited in scope" and which "did not prohibit laws regulating who may possess and carry weapons or purchase them, or where such weapons may be carried."  <u>Id.</u>  As a result, the SJC held that <u>Heller</u> did not make the Commonwealth's firearm licensing requirement unconstitutional.  <u>Id.</u> at 1130 ("[T]he requirement of 'prior approval by a government officer,' or a licensing system, does not by itself render the statute unconstitutional on its face.").

exculpatory, non-cumulative evidence in support of his defense.  Id. at 38–39.[5]  The Appeals

Court summarily rejected this argument.  Silva, 2013 WL 6633943, at *2 n.1.

Silva's argument centers on the defense theory that photographs purporting to be of "the

firearm located next to the vehicle as [Officer McCormack] found it," [S.A. at 421–22], were not

actually representative of the scene because the police officer who took the photograph allegedly

arrived after the firearm was removed from its initial location and placed in a box, [id. at 536].

The testimony at trial established that Officers McCormack and Condon stopped Silva and an

individual who was with Silva and called for backup.  [Id. at 404–16].  Officers McNeil and

Hancock responded as backup.  [Id. at 522–24].  A sergeant was also requested, pursuant to

Boston Police Department procedure, to photograph the evidence.  [Id. at 447–48].  After

Officers McNeil and Hancock got to the scene, Officer McCormack asked them to stay with

Officer Condon, Silva, and the individual who was with Silva "while he went back to a certain

area to look for anything."  [Id. at 508–09].  Officer Hancock testified on direct examination that

he first saw the firearm when "it was in a box on the hood of a police car" and that he made the

firearm safe.  [Id. at 525, 528].  He then testified on cross-examination that the firearm was in a

box on top of a police car when he got to the scene, [id. at 531], but later denied that and clarified

that "by the time I dealt with that firearm it was in a box on a car.  But that's not what I'm saying

when I arrived on scene that's where it was," [id. at 551].  Officer McCormack testified that the

_____

[5] Silva objects to rulings by the trial court including: 1) the trial court's exclusion of exculpatory
evidence that the gun was moved by the police prior to being photographed; 2) the exclusion of
exculpatory impeachment evidence in the form of the CAD sheet; 3) that Silva's cross
examination was restricted by exclusion of the CAD sheet; 4) jury instructions that instructed
that certain testimony should be disregarded; and 5) the trial court's denial of a continuance and
refusal to issue a capias to the Boston Police Department.  [ECF No. 1-1 at 37–39].

firearm was moved when the sergeant that was called to photograph it took custody of it.  [Id. at 450].

Defense counsel cross-examined Officer Hancock on his arrival time and repeatedly attempted to use a CAD sheet to refresh his memory about his arrival time.  See [id. at 531–49]. Officer Hancock's memory could not be refreshed with the CAD sheet, which he had difficulty interpreting,[6] [id]; Officer Hancock, however, did testify that he arrived at the scene before Sergeant Moore, who photographed the firearm, [id. at 543].  When the relevance of the CAD sheet was questioned by the Court, defense counsel made the following *ex parte* offer of proof:

> Judge, this particular police officer indicated that when he got there that the gun was already in a box on top of a vehicle.  It appears from the CAD sheet that the person who took the photographs doesn't even arrive until after this officer arrives. So how could he have taken photographs of the vehicle if the gun is already in a box on top of a vehicle when Hancock arrives.

[Id. at 536].[7]  Defense counsel then attempted to subpoena a keeper of records from the Boston Police Department to admit the CAD sheet.  [Id. at 667–70].  The Police Department would not accept service of the subpoena after 5 p.m., and the Court would not continue the case or issue a capias to the Police Department.  [Id. at 667–68, 670].

---

[6] After the Court sustained an objection to reading from the CAD sheet, which was not in evidence, it allowed limited use of the CAD sheet to refresh Officer Hancock's memory.  [S.A. at 546].  Officer Hancock, however, could not be refreshed, at which point, the Court instructed the jury to "disregard all of this," in reference to defense counsel's attempt to refresh Officer Hancock.  [Id. at 546–49].  As noted in Section D., infra, this Court's habeas review of jury instructions is limited.  The trial court's innocuous instruction did not violate any right that was guaranteed to the defendant by the Fourteenth Amendment.  See Lucien v. Spencer, No. 07-cv-11338-MLW, 2015 WL 5824726, at *12 (D. Mass. Sept. 30, 2015).

[7] Counsel's reference to "tak[ing] photographs of the vehicle" is presumably a reference to taking photographs of the scene, which would include photographs of the vehicle as well as the placement of the firearm next to the vehicle.

A criminal defendant has a constitutional right to present a defense to criminal charges. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes, 547 U.S. at 324 (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998). "As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Id. (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)). The exclusion of evidence is not unconstitutionally arbitrary or disproportionate unless it significantly infringes upon a material and important interest of the accused. Id. (holding that blanket exclusion of polygraph evidence was rational and proportional). "[T]he Supreme Court cases undoing state court convictions based on exclusion of evidence involve egregious situations 'and the more recent decisions of the Court . . . create serious doubts that the Court is interested in carrying the doctrine beyond egregious cases.'" DiBenedetto v. Hall, 272 F.3d 1, 8 (1st Cir. 2001) (quoting Fortini v. Murphy, 257 F.3d 39, 46 (1st Cir. 2001)).

In support of his argument that his rights were violated, Silva relies on Holmes v. South Carolina, which involved a petitioner seeking relief from a conviction for, *inter alia,* the sexual assault and murder of an elderly woman. 547 U.S. at 321–24. In Holmes, the trial court

16

excluded third-party guilt evidence under a state common law rule that makes third-party guilt evidence admissible where it "raise[s] a reasonable inference or presumption as the defendant's own innocence" but inadmissible if it only "cast[s] a bare suspicion upon another" or "raise[s] a conjectural inference as to the commission of the crime by another."  Id. at 323–24 (referencing State v. Gregory, 16 S.E.2d 532, 534 (S.C. 1941)) (internal quotations omitted).  Holmes wanted to introduce evidence that another person had been in the victim's neighborhood near the time when the crime occurred and, more significantly, the testimony of four witnesses stating that this third-party had either admitted that Holmes was innocent or admitted to committing the crimes himself.  Id. at 323.  On appeal, the South Carolina Supreme Court found no error with the trial court's exclusion of the evidence.  Id. at 324.  Relying on Gregory, as well as a more recent decision in State v. Gay, 541 S.E.2d 541 (S.C. 2001), the South Carolina Supreme Court held that Holmes could not "raise a reasonable inference of his own innocence" in order to make the third-party guilt evidence admissible because of the overwhelming amount of forensic evidence against him.  Id.

The Supreme Court reversed the South Carolina Supreme Court's ruling in Holmes, holding that excluding evidence of third-party guilt based on the strength of the prosecution's case and without consideration of other factors, violated the defendant's constitutional rights.  Id. at 325, 331.  The Court explained that although defense evidence cannot be excluded pursuant to rules "that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote," it is also well established that the rules of evidence allow trial judges to exclude evidence if its probative value is outweighed by unfair prejudice, confusion of the issues, or potential to mislead the jury.  Id. at 326–27.  South Carolina's application of this principle in Holmes was found to unconstitutionally limit the defendant's right to a complete defense

because the trial judge focused only on the strength of the prosecution's case rather than considering the probative value of the defense's evidence of third-party guilt.  Id. at 329.  Under South Carolina's interpretation, "if the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value . . . ."  Id.  The Supreme Court rejected this rule as arbitrary "in the sense that it does not rationally serve the end . . . that the third-party guilt rules . . . were designed to further" and because it violated a criminal defendant's right to present a complete defense.  Id. at 331.

Silva does not explain how the factually distinct Holmes case supports his argument that he was prevented from meaningfully presenting his defense.  The evidence at issue was not evidence of third-party guilt, but rather consisted of evidence showing minor inconsistencies in the prosecution's evidence.

Further, unlike Holmes and consistent with the holding in Scheffer, the evidence of the CAD sheet was not excluded based on some arbitrary rule but was excluded under foundational rules of evidence.  For example, the CAD sheet itself was never admitted into evidence because it was hearsay, and the defense took no affirmative actions to seek to have it admitted through a keeper of records until after the close of the first day of trial.  See [S.A. at 662–63].  In addition, testimony concerning the arrival times of the various police officers responding to the scene and the movement of the gun at the scene was presented to the jury, and defense counsel had an opportunity to cross-examine each officer about these topics.  See, e.g., [id. at 447–48, 450, 523–24, 551].  The inconsistencies that defense counsel sought to present to the jury through admitting the CAD sheet, and any resulting reasonable doubt, were already on the record based on Officer Hancock's varying testimony concerning when the firearm was first placed in the box in relation to when he arrived at the scene.  See [id. at 531, 551].

Similarly, the trial court's denial of a continuance and refusal to issue a capias to the Boston Police Department in order to allow a keeper of records to testify did not unconstitutionally limit the defendant's right to a complete defense because such testimony would have been cumulative in light of the cross-examination the preceding day.  The defense made the strategic decisions to not call Sergeant Moore, who photographed the scene, as part of the defense case and to not argue Officer Hancock's varying testimony concerning the location of the gun in closing.  Instead, in closing, defense counsel questioned why the Commonwealth had not called Sergeant Moore and did not reference the issue of the firearm in the box.  See, e.g. [id. at 691–99].[8]

After a careful review of the record, the Court cannot find that the trial court's rulings exceeded its discretion, unduly impacted a weighty interest of Silva's, or were contrary to federal law.  The Court agrees with Respondent that the Appeals Court's decision to summarily deny Silva's appeal on this issue was not contrary to clearly established Supreme Court precedent on materially indistinguishable facts or an incorrect legal rule.  [ECF No. 20 at 33].  This is also not an "egregious" case of evidence being excluded that warrants habeas relief because a defendant has been deprived of his right to present a complete defense.  The Court also cannot find that the decisions made during the trial had a substantial and injurious effect on the jury's verdict since the excluded testimony was largely addressed by other means and at most related to whether

---

[8] Before trial began, counsel discussed Sergeant Moore with the trial court.  See [S.A. at 375–77].  The prosecutor asked the court for direction on whether Sergeant Moore's photographs could be admitted through another witness or if Sergeant Moore needed to testify because his testimony "would just be that he came with a camera and took photographs."  [Id. at 377].  Defense counsel stated she did not object to the photographs being admitted through another witness so long as she would be able to cross-examine the witness on the lighting conditions at the scene.  [Id. at 376].

there were collateral inconsistencies in the police officers' accounts of what happened.  This is insufficient for this Court to reverse the Appeals Court.

> **D.      Alleged Violation of Silva's Due Process Rights Based on Trial Court's Reasonable Doubt Jury Instruction**

Silva argues that the Appeals Court erred in rejecting his argument that the trial court erred in its instruction to the jury on reasonable doubt.  [ECF No. 1-1 at 44].  In particular, Silva claims that the trial court diminished the burden of proof required of the prosecution and improperly shifted the burden onto him.  [Id. at 45].

Silva raised the federal constitutional issue before the Appeals Court by arguing that the reasonable doubt instruction violated his Fifth, Sixth, and Fourteenth Amendment rights.  Silva, 2013 WL 6633943, at *1.  The Appeals Court rejected this argument and explained that "[a]lthough the jury instructions were not optimal, there was no error since the trial court correctly conveyed the 'active ingredients' of the Webster charge."  Id. (citing Commonwealth v. Webster, 59 Mass. 295, 320 (1 Cush.) (1850) (abrogated by Commonwealth v. Russell, 23 N.E.3d 867 (Mass. 2015)).  The "active ingredients" required by Commonwealth v. Webster, 59 Mass. 295 (1 Cush.) (1850) (abrogated by Russell, 23 N.E.3d 867), "include reference to the fact that the entire burden of proof is on the Commonwealth; that the case must be decided on all the evidence; that the jury must have an 'abiding conviction, to a moral certainty, of the truth of the charge;' that 'mere possible doubt' or proof of 'a probability, though not a strong one' are not enough; and that 'reasonable and moral certainty [involve] a certainty that convinces and directs the understanding, and satisfies the reason and judgment, of those who are bound to act

conscientiously upon it.'"[9]  Silva, 2013 WL 6633943, at *1 (quoting Commonwealth v. Watkins,

744 N.E.2d 645, 649 (Mass. 2001)).

"[T]he Due Process Clause protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

charged."  In re Winship, 397 U.S. at 364.  The Supreme Court analyzes reasonable doubt

instructions for constitutional infirmity based on "whether there is a reasonable likelihood that

the jury" actually applied the instructions in an unconstitutional manner.  Victor v. Nebraska,

511 U.S. 1, 6 (1994) (assessing whether the instructions were understood by the jury to allow

conviction based on proof insufficient to meet the In re Winship standard).  "[S]o long as the

court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable

doubt the Constitution does not require that any particular form of words be used in advising the

jury of the government's burden of proof."  Id. at 5 (citations omitted).  Instead, "taken as a

whole, the instructions [must] correct[ly] convey the concept of reasonable doubt to the jury."

Id. (alternations in original) (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

"'Before a federal court may overturn a conviction resulting from a state trial because of

an erroneous jury instruction, it must be established not merely that the instruction is undesirable,

erroneous, or even 'universally condemned,' but that it violated some right which was

guaranteed to the defendant by the Fourteenth Amendment."  Lucien v. Spencer, No. CA07-

11338-MLW, 2015 WL 5824726, at *12 (D. Mass. Sept. 30, 2015) (citing Cupp v. Naughten,

414 U.S. 141, 147 (1973)); see also Gaines v. Matesanz, 272 F. Supp. 2d 121, 131 (D. Mass.

2003) ("As a general rule, improper jury instructions will not form the basis for federal habeas

---

[9] In 2015, the Supreme Judicial Court adopted a uniform instruction on proof beyond a
reasonable doubt that "uses more modern language, but preserves the power, efficacy, and
essence of the Webster charge."  Commonwealth v. Russell, 23 N.E.3d 867, 877 (Mass. 2015).

corpus relief.  The question presented to the federal court is whether the challenged jury instructions violated the petitioner's constitutional rights." (internal citations and quotations omitted)).  To establish such a constitutional violation, "the petitioner must show that the allegedly defective jury instruction 'so infected the entire trial that the resulting conviction violates due process.'"  Lucien, 2015 WL 5824726, at *12 (quoting Estelle, 502 U.S. at 72).

The trial court gave the following reasonable doubt instruction to the jury:

> Now, we keep using the term reasonable doubt.  What is proof beyond a reasonable doubt?  Proof beyond a reasonable doubt does not mean proof beyond all possible or imaginary or whimsical doubt or proof beyond all possibility of innocence.  A reasonable doubt does not mean the kind of doubt that can be conjured up by someone who is seeking for doubt or for an excuse to acquit a defendant.  Instead, a reasonable doubt means such doubt as remains in the mind of a reasonable person who is earnestly seeking the truth.

> The Commonwealth is not required to prove the defendant's guilt to an absolute or mathematical certainty, the kind of certainty that you have when you add two and two and get four.  But the Commonwealth is required to prove more than a probability.  They're required to prove the defendant's guilt to a moral certainty, the kind of certainty that satisfies your judgment and your consciences as reasonable men and women and leaves in your mind a clear and settled conviction that the defendant is guilty.

[S.A. at 713].

Silva asserts that this instruction included language that was highly prejudicial and contrary to clearly established Supreme Court precedent because it lessened the Commonwealth's burden of proof.  [ECF No 1-1 at 45–46].  Silva argues that the instruction's use of negative phrases impermissibly confused and "trivialized and minimized" the standard of proof such that the instruction was tantamount to telling the jurors that certainty was not required.  [Id. at 46–47].  In addition, he asserts that the instruction failed to tell the jurors that they must acquit the defendant if they had reasonable doubt.  [Id. at 46].  The trial court's instructions, however, when viewed as a complete charge, did not lessen the Commonwealth's burden of proof.  The trial court instructed the jury that the Commonwealth must "prove the

defendant's guilt to a moral certainty," which was defined as "a clear and settled conviction that the defendant is guilty," that the Commonwealth bore the burden of proving each element of each offense charged beyond a reasonable doubt, and that the burden "never shifts." [S.A. at 710, 713–16]. Further, the trial court instructed the jury that the "presumption of innocence is a rule of law that requires you to find [Silva] not guilty unless and until the Commonwealth has produced evidence from whatever source that proves the defendant is guilty beyond a reasonable doubt." [Id. at 710]. Viewing the complete charge, there is not a reasonable likelihood that the jurors actually understood the instructions to allow for conviction on a burden less than proof beyond a reasonable doubt or that the jurors actually applied the instructions in an unconstitutional manner. See Victor, 511 U.S. at 5–6.

Silva also contends that the jury instruction language that "a reasonable doubt does not mean the kind of doubt that can be conjured up by someone who is seeking . . . for an excuse to acquit the defendant" combined with the trial court's alleged failure to instruct the jury on the presumption that the defendant was innocent, unconstitutionally shifted the burden. [ECF No. 1-1 at 44–46]. As pointed out by Respondent, however, the trial court did in fact instruct the jury that Silva was presumed innocent. [ECF No. 20 at 46 n.25; S.A. at 710]. In addition, the "conjured up by someone" language used did not shift the burden of proof, and the cases cited by Silva in support are not on point. Indeed, in Gilday v. Callahan, 59 F.3d 257 (1st Cir. 1995), cited by Silva, the First Circuit left intact a conviction that included language to the effect of "a doubt which is conjured up." 59 F.3d at 266. Similarly, the "excuse to acquit the defendant" language also did not improperly shift the burden. [ECF No. 1-1 at 46–48]. Silva has cited no Supreme Court case holding this language to be unconstitutional, and the First Circuit has upheld convictions in cases where the instructions included the phrase "excuse to acquit the defendant."

23

See, e.g., United States v. Vavlitis, 9 F.3d 206, 212 (1st Cir. 1993); Watkins v. Ponte, 987 F.2d 27, 32 (1st Cir. 1993).

The other cases Silva relies on, Francis v. Franklin, 471 U.S. 307 (1985) and Sandstrom v. Montana, 442 U.S. 510 (1979), concerned language not at issue here and do not change the analysis. Both Francis and Sandstrom involved jury instructions that used language that a reasonable juror could have understood to create a mandatory presumption on an essential element of a crime and therefore impermissibly shifted the burden. See Francis, 471 U.S. at 316, 321 (involving instruction that "acts of a person of sound mind and discretion *are presumed* to be the product of the person's will" and that a person *"is presumed* to intend the natural and probable consequences of his acts"); Sandstrom, 442 U.S. at 512 (concerning instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts"). In contrast, the instruction at issue here did not reference any presumption in contravention of the holdings in Francis or Sandstrom, and Petitioner does not allege that the jury reached their verdict by applying an impermissible presumption. Because Francis and Sandstrom addressed language not found in this instruction, neither of these cases establishes that the language used in the jury instruction at issue impermissibly shifted the burden. This Court, therefore, does not find that the use of the phrase "conjured up by someone who is seeking . . . for an excuse to acquit the defendant" in the context of the jury instructions given violated clearly established precedent or impermissibly shifted the burden in a way that offended the Constitution.

Accordingly, Silva has failed to demonstrate that the reasonable doubt instructions were contrary to clearly established federal law.

**E.     Alleged Violation of Silva's Due Process Rights Based on Prosecutor's Opening and Closing Statements**

Silva argues that the Appeals Court erred in how it dealt with certain prosecution statements made during the trial.  [ECF No. 1-1 at 53].  More specifically, during closing argument, the prosecutor referred to Silva's defense case as a "junk drawer" and a "distraction." Silva, 2013 WL 6633943, at *1.  Silva also claims that the prosecutor argued facts that were not in evidence during her opening argument when she stated that the firearm was placed in the snow ten minutes before the police officers found it.  [ECF No. 1-1 at 54].  Finally, Silva argues that the prosecutor misstated the evidence in her closing when she asked the jury to infer that it was Silva's partial fingerprint that was found on the firearm.  [Id. at 55].

Under well-established federal law, "the relevant question" when assessing whether a prosecutor's statements violated a defendant's due process rights "is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 644 (1974)).  It "is not enough that the prosecutors' remarks were undesirable or even universally condemned."  Id. (quoting Darden v. Wainwright, 699 F.2d 1031, 1036 (11th Cir. 1983)).  As explained infra, none of the prosecutor's statements that Silva challenges meets the Darden standard or requires reversal of his conviction.  Accordingly, Silva has failed to show that the Appeals Court violated a clearly established principle of federal law in not ruling in his favor on his claims related to the prosecutor's statements.

1.     Prosecutor's Statement Regarding the "Junk Drawer" and a "Distraction"

Silva first argues that the prosecutor improperly disparaged the defense by analogizing Silva's case to a "junk drawer" and referring to it as a "distraction."  [ECF No. 1-1 at 54].  Silva claims that these statements crossed the line from permissible inferences that the prosecutor

could argue to an impermissible expression of the prosecutor's opinion as to the strength of the evidence.  [Id. at 54–55].  The Appeals Court specifically rejected these arguments based on Massachusetts cases that hold that a prosecutor may properly use analogy, example, and hypothesis in aid of her argument and comment on evidence on the record as well as the defense's efforts to distract or confuse the jury.  Silva, 2013 WL 6633943, at *1.

Silva cites Herring v. New York, 422 U.S. 853 (1975), and Francis, in support of his arguments that the prosecutor may not disparage the defense or express a personal opinion about the strength of the evidence developed at trial, and claims that the trial court failed to issue a proper curative instruction.  [ECF No. 1-1 at 54–55].  Silva argues that these actions shifted the burden of proof onto him, thus violating his rights to due process and a fair trial.  [Id.].  The law cited by Silva, however, is inapposite.  First, Herring does not support Silva's position, since that case held that denying a defendant the opportunity to present a closing argument was unconstitutional.  422 U.S. at 862–63 (noting that "[o]nly [at closing argument] can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions").  Silva's reliance on Francis, is also misplaced because that case held that a jury instruction did not comport with due process when a reasonable juror could have understood the instruction to create a mandatory presumption against the defendant regarding intent, and where the instruction when read as a whole did not explain or cure the error.  471 U.S. at 325.

The standard set forth in Darden controls the analysis and requires that Silva's argument be rejected.  The Court cannot conclude that passing references to Silva's defense as a distraction, or analogizing Silva's defense case to a junk drawer, "so infected the trial with

unfairness" as to violate Silva's due process or fair trial rights during opening or closing

statements.

> 2. The Prosecutor's Statement During Opening Argument That the Firearm Was Placed in the Snow Ten Minutes Before It Was Found by the Police.

Silva also argues that the prosecutor did not have a good faith basis to discuss the

placement of the firearm in the snow bank and further, that the statement was not supported by

the evidence. [ECF No. 1-1 at 54]. During opening argument, the prosecutor made the

following statement:

> It's our belief that today, potentially tomorrow, we will give you testimony that will show how it was that loaded firearm is sitting on top of that snow bank on that [cold] January night on Harrow Street. You're going to hear testimony that two officers were on patrol that night. They were in uniform and they were in a marked Boston Police Department cruiser. Let's rewind ten minutes from when that firearm is sitting out on that snowbank. Let's rewind to about 2:18 a.m. They're on Groom Street, they take a left on Harrow towards Humphreys and they see the defendant and another individual walking in the middle of the street. They slow their car down, and as they approach they see only the defendant, Mr. Silva, walk towards the edge of the sidewalk and bend down and then stand back up and walk towards the officers. The other individual is staying in the middle of the sidewalk. You're going to hear testimony that the officers then went over to that very area where the defendant, Mr. Silva, bent down . . . . In that very area where the defendant bent down was the firearm.

[S.A. at 395]. Silva alleges that the statement "rewind[ing] ten minutes" violated his rights to

due process and a fair trial because it was not supported by the evidence. [ECF No. 1-1 at 54].

The Appeals Court, which summarily rejected this argument, Silva, 2013 WL 6633943, at *2,

did not violate a clearly established principle of federal law in failing to rule in Silva's favor on

this issue because the prosecutor's opening remarks were consistent with the evidence that was

adduced at trial and thus did not violate Silva's fair trial or due process rights under Darden. See

Darden, 477 U.S. at 181.

Taken in context, the prosecutor's statement could reasonably have been interpreted by the jury to mean that the evidence would show that "ten minutes from when that firearm is sitting out on that snowbank," the police officers turned left on Harrow and saw the defendant walking down the street.  The evidence elicited by the prosecution at trial from the police officer who located the firearm was consistent with this interpretation.  [S.A. at 407–20].  Specifically, the police officer testified that: he was patrolling the area around 2:15 a.m. and was in the passenger seat when the patrol car turned onto Harrow Street; while moving at a "rolling" speed in the patrol car, he observed the defendant walk 30 to 35 yards to the sidewalk in a "quick move"; he then observed the defendant walk behind a car parked next to the sidewalk, bend over for less than five seconds while extending his arm, and then stand up and continue walking on the sidewalk.  [Id. at 407–13].  The officers stopped and exited their vehicle, and the officer walked to the sidewalk and spoke to the defendant before requesting a backup unit.  [Id. at 414–15]. Once the backup units responded, the officer walked to the vehicle and to where he had seen the defendant bend down and located the firearm.  [Id. at 415, 418].  The officer gave no testimony concerning the amount of time between when he turned onto Harrow Street and when he located the firearm.  One of the backup officers who responded to the scene could not testify accurately to his specific arrival time, but stated that his response time could have ranged from "less than five minutes" to "more than ten minutes" depending on where he was when he received the call. [Id. at 540].  Based on the testimony of the police officers, a jury could reasonably infer that approximately ten minutes elapsed between when the officers turned onto Harrow Street and when the gun was recovered, thus making the prosecutor's summary of the evidence to be presented reasonable and any possible error harmless.

3.      The Prosecutor's Closing Argument About the Fingerprint on the
        Firearm

Testimony at trial demonstrated that a partial, unidentifiable fingerprint was found on the

firearm that Silva was convicted of possessing.  In closing, the prosecutor argued, consistent with

the evidence presented, that although the fingerprint could not be identified as Silva's, there was

indeed a fingerprint present on the firearm.  [Id. at 703–04].  Silva argues that by making this

argument, the prosecutor asked the jury to draw an impermissible inference that the fingerprint

was in fact Silva's, even though a fingerprint expert testified that there was insufficient ridge

detail to make a comparison, and that this violated his rights to due process and a fair trial.  [ECF

No. 1-1 at 55–56].  The Appeals Court rejected this argument based on Massachusetts cases that

establish that the prosecutor may argue from the evidence and in support of fair inferences that

may be drawn from the evidence.  Silva, 2013 WL 6633943, at *1.  The Appeals Court further

found that the prosecutor's argument that there was a fingerprint on the gun, even though it could

not be shown conclusively to be Silva's, was a proper response to the defense's argument that

there was no fingerprint present on the gun.  Id.

In his Petition, Silva relies on the Supreme Court cases Francis and In re Winship and the

First Circuit case Greenberg v. U.S., 280 F.2d 472 (1st Cir. 1960), in support of his claim that the

prosecutor's argument requires reversal.  [ECF No. 1-1 at 55–56].  The Court finds that none of

these cases supports Silva's argument or requires reversal.  In In re Winship, the Supreme Court

made a general holding concerning a defendant's rights under the Due Process Clause.  See In re

Winship, 397 U.S. at 364 (holding that "the Due Process Clause protects the accused against

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

crime with which he is charged").  In Francis, the Supreme Court reiterated its holding from In re

<u>Winship</u> and addressed the constitutionality of a jury charge.  <u>See generally</u> 471 U.S. 307.

Neither of these cases suggests that the prosecutor's statement at issue here was impermissible.

<u>Greenberg</u> concerned an appeal of a jury verdict finding the defendant guilty of filing

false and fraudulent tax returns based on an improper closing argument.  280 F.2d at 473.

During closing argument, the prosecutor engaged in "oratory" concerning the defendant's lack of

patriotism, later identified himself as "a sort of thirteenth juror," and "expressed his personal

opinion of the trustworthiness of the government's evidence and the consequent guilt of the

accused."  <u>Id.</u> at 474.  The First Circuit concluded that the prosecutor's conduct was

inappropriate and in contravention of the "elemental and fundamental" rule of the Canons of

Professional Ethics that "[i]t is improper for a lawyer to assert in argument his personal belief in

his client's innocence or in the justice of his cause."  <u>Id.</u> at 474–75.  The First Circuit set aside

the verdict and remanded the case for a new trial.  <u>Id.</u> at 477.

<u>Greenberg</u>'s holding does not support Silva's argument, however, because the

prosecutor's statements concerning fingerprints was not a statement of the prosecutor's personal

belief in the justice of his cause or Silva's guilt.  The prosecutor's closing argument included

following statement: "The fingerprint lab was not willing to say that there was enough to make a

comparison to the defendant.  And I'd ask you to take that for what it is.  If they don't have

enough, they don't have enough.  But there was a print on that gun, make no mistake about it."

[S.A. at 704].  Rather than passing judgment on Silva's guilt or the justness of the prosecution's

cause, these comments were limited to arguing the evidence and did no more than encourage the

jury to draw reasonable inferences from the evidence presented.  Because the prosecutor's

argument about the fingerprint was consistent with the evidence presented and did not violate

Silva's rights or unduly infect Silva's trial, Silva has failed to show that the Appeals Court violated a clearly established principle of federal law in failing to rule in his favor.

### F.     Alleged Violation of Silva's Due Process and Fair Trial Rights Based on Trial Court's Refusal to Give a Specific Jury Instruction

Silva argues that his due process and fair trial rights were violated when the trial court declined to give a model instruction to the jury that mere knowledge and presence in the vicinity of a firearm does not constitute a crime.  [ECF No. 1-1 at 57].  Silva requested that the trial court instruct the jury that: "I caution you to remember that merely being present in the vicinity of a firearm, even if one knows that it is there, does not amount to possession."  [Id. at 58; see also S.A. at 720–21].  Instead, the Court instructed the jury that: "Now, with regard to presence in the vicinity of a crime, no one is guilty merely because they are present in the vicinity of a crime, and you should always keep that in mind.  The Commonwealth is required to prove that the defendant is guilty of the crimes charged beyond a reasonable doubt, not that he was present in the vicinity of the crime."  [S.A. at 722].

As noted in Section D, supra, this Court's habeas review of jury instructions is limited. "Before a federal court may overturn a conviction resulting from a state trial because of an erroneous jury instruction, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."  Lucien, 2015 WL 5824726, at *12 (internal corrections omitted) (citing Cupp, 414 U.S. at 147).  To establish such a constitutional violation, "the petitioner must show that the allegedly defective jury instruction 'so infected the entire trial that the resulting conviction violates due process.'"  Id. (quoting Estelle, 502 U.S. at 72).  Silva has failed to show that the trial court's instruction on proximity was defective at all, much less so defective that it infected the entire trial in violation of Silva's due process rights.

The trial court's instruction made it clear to the jury that the Commonwealth bore the burden of proof beyond a reasonable doubt, and that Silva's mere presence near the weapon was insufficient to convict.  Silva has not cited any authority that suggests a different conclusion is required.

### G.  Alleged Violation of Silva's Due Process and Fair Trial Rights Based on Inadequacy of Trial Court's Curative Instructions and Failure to Declare Mistrials

Silva contends that his due process and fair trial rights were violated by the trial court's inadequate curative instructions in three instances.  [ECF No. 1-1 at 60–64].  To the extent that any improper testimony was admitted by the trial court, "[w]ithin wide margins, the prejudice caused by improper testimony can be addressed by providing appropriate curative instructions." United States v. De Jesus Mateo, 373 F.3d 70, 73 (1st Cir. 2004) (citing United States v. Sepúlveda, 15 F.3d 1161, 1184 (1st Cir. 1993)).  The corollary to this rule is the "almost invariable assumption of the law that jurors follow their instructions."  See Richardson v. Marsh, 481 U.S. 200, 206 (1987).  The presumption that jurors follow instructions, however, "may be rebutted 'on a sufficient showing that the offending testimony reasonably could not have been ignored and that serious prejudice likely resulted.'"  United States v. Gonzalez-Vazquez, 219 F.3d 37, 48 (1st Cir. 2000) (quoting United States v. Rullán-Rivera, 60 F.3d 16, 18 (1st Cir. 1995)).  Silva fails to carry this burden in each of the arguments that he raises in his Petition and, therefore, fails to show that the curative instructions given or the failure to declare a mistrial were contrary to clearly established federal law.

### 1.  Curative Instruction and Refusal to Grant a Mistrial Following Improper Testimony by Officer McCormack

Silva argues that the trial court erred by failing to grant a mistrial after Officer McCormack testified that Silva bent down and "[i]t looked like he placed something."  [ECF No.

1-1 at 60–61].  The trial court had previously ruled on Silva's pre-trial motion *in limine* seeking

to exclude "[Officer] McCormack['s] speculative testimony regarding the ultimate issues."  [S.A.

at 335].  As defense counsel explained:

> [Officer McCormack] said at the motion to suppress [hearing] that [Silva] bent over
> consistent with . . . disposing of contraband or weapons. . . . I don't have an issue
> with [Officer McCormack] saying he saw [Silva] bend over.  I don't have [an] issue
> with somebody else saying that they found a gun in that place.  I just don't think
> [Officer McCormack] gets to speculate in front of the jury that it was as if to put
> contraband or a weapon on the ground.

[Id. at 336].  The trial court agreed and instructed the prosecution that Officer McCormack was

"not going to be allowed to say that [what he observed Silva doing] was consistent with anything

. . . ."  [Id.].  The trial court further ordered the prosecutor to inform Officer McCormack ahead

of trial that such testimony was excluded.  [Id. at 337].  On direct examination, Officer

McCormack was asked, "Once the additional units responded, what did you do?", to which he

responded, "I walked back to the vehicle [where] I observed the gentleman bend down.  It looked

like he placed something . . . ."  [Id. at 416].

Counsel for Silva objected based on her belief that the statement "looked like he placed

something" was in contravention of the earlier motion *in limine* ruling.  [Id.].  In response, the

trial court issued a curative instruction to the jury that it should disregard any "conclusions"

made by witnesses.  [Id. at 417].  Defense counsel objected again that the first curative

instruction was insufficient and requested an additional, specific instruction that the jury

disregard any testimony about Silva attempting to place anything on the ground.  [Id. at 418].

The trial court then made an additional curative instruction to the jury stating that:

> So, ladies and gentlemen, just a little more on that instruction I just gave you.
> Specifically you are going to conclude what the person may or may not have been
> doing at the time that the testimony indicates he may have bent down.  That's your
> conclusion to make.  So you disregard entirely any conclusion as to what he may
> have been doing at that time.  You disregard it totally.  You will reach your own

conclusions and make your own inferences on all of the events presented in the case.

[Id.].

Silva did not object that this second curative instruction was inadequate, see [id. at 418–19], and only now argues that the instruction was insufficiently specific because "there is no way to know exactly what the jurors considered a conclusion," [ECF No. 1-1 at 62].  According to Silva, this insufficiently specific corrective instruction violated his Fifth, Sixth, and Fourteenth Amendment due process and fair trial rights and required a mistrial.  [ECF No. 1-1 at 62].

As an initial matter, a review of the record demonstrates that no impermissible testimony was elicited from the witness.  On the pre-trial motion *in limine*, the trial court excluded testimony concerning what Silva's actions were "consistent" with, such as that bending over behind a car would be consistent with depositing contraband.  See [S.A. at 336].  In contrast, the testimony elicited from Officer McCormack was limited to what he observed: "It looked like he placed something . . . ."  [Id. at 416].  This testimony was immediately followed by Officer McCormack clarifying that he did not see anything in Silva's hand when he bent down and did not actually see any object placed on the ground.  [Id. at 419].

To the extent that Officer McCormack's testimony could be interpreted to be improper, any prejudice stemming from it was cured by the instruction that followed.  See Greer v. Miller, 483 U.S. 756, 766 (1987).  In evaluating a claim that the presentation of inadmissible evidence violated a defendant's constitutional rights, the Court must determine whether that evidence so infected the trial with unfairness as to render the conviction invalid.  Romano v. Oklahoma, 512 U.S. 1, 12 (1994).  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate 'fundamental fairness' very narrowly."  Dowling v. United States, 493 U.S. 342, 352

(1990).  Silva has pointed to no well-established federal law requiring a reversal in this circumstance, particularly where the trial court responded to his objections with two adequate curative instructions that informed the jury that Officer McCormack's testimony could not supplant the jury's role as fact finder.  As in Greer v. Miller, 483 U.S. 756 (1987), this Court cannot conclude that Officer McCormack's allegedly improper testimony, followed by an objection and two adequate curative instructions, so infected the trial with unfairness as to violate Silva's constitutional rights.  See 483 U.S. at 766 (concluding that "[t]he sequence of events [in this case]—a single question, an immediate objection, and two curative instructions—clearly indicates that the prosecutor's improper question did not violate [the defendant]'s due process rights.").

2.   <u>Curative Instruction Following Reading of an Incorrect Charge by the Clerk</u>

At the commencement of the jury empanelment, the clerk mistakenly read to the jury charges against Silva that had been dismissed prior to trial, including a charge of possession of a large capacity weapon.  [ECF No. 1-1 at 63; S.A. at 379].  Silva's counsel objected and requested a mistrial, which the trial court denied.  [S.A. at 385–86].  The trial court then instructed the jury that "I think [you] heard something about . . . large capacity.  That is not a part of this case.  So please disregard any such statement . . . ."  [Id. at 386–87].  Silva now argues that this curative instruction was inadequate because the jury was never instructed that this statement by the clerk was a mistake and not to use the mistake in their deliberations or in reaching their decision. [ECF No. 1-1 at 63].  Silva argues that this left the jury to speculate about the mention of the large capacity weapon, including whether it was part of a different case against Silva.  [Id.].  Silva has not explained how this misstatement, followed by the trial court's corrective

35

instruction, so infected the trial with unfairness as to violate Silva's constitutional rights.  Nor has Silva cited any clearly-established federal law that was violated.

        3.      <u>Curative Instruction Following Officer McCormack's Testimony that He Knew Silva from Previous Interactions</u>

Silva claims that his constitutional rights were violated because Officer McCormack twice testified during the trial that he knew Silva prior to the night of his arrest.  [ECF No. 1-1 at 63–64]; <u>see</u> [S.A. at 477–78 (stating that he "had met Mr. Silva before" and that he "knew the gentleman")].  Following each of these statements, the trial court issued a curative instruction that the jury should disregard Officer McCormack's testimony on that point.  [S.A. at 477 ("Disregard the answer, please."); <u>id.</u> at 478 ("Ladies and gentlemen, you will disregard the last part of the answer, please.")].  Silva now argues that the trial court should have given an additional curative instruction or granted a mistrial because "[t]he jury could have used this evidence to impermissibly infer that Silva had engaged in bad acts in the past and therefore must be guilty of possessing a firearm . . ."  [ECF No. 1-1 at 64].

The two statements made by Officer McCormack concerning his familiarity with Silva were both made while he was being cross-examined by Silva's counsel.  <u>See</u> [S.A. at 477–78; ECF No. 20 at 78–79].  Each statement was followed by a prompt curative instruction from the trial court instructing the jury to disregard the testimony that Officer McCormack already knew Silva.  [S.A. at 477–78].  Following the curative instructions, Silva's counsel did not request further instructions or move for a mistrial.  <u>See</u> [<u>id.</u>].  In the final jury charge, the trial court also instructed the jurors that if she had struck anything from the record, they were to disregard it as evidence.  [<u>Id.</u> at 707].

The Court cannot conclude that the trial court committed constitutional error by not declaring a mistrial or that the Appeals Court did by declining to reverse.  The objectionable

testimony was promptly objected to and corrected by the trial court before the jury, and the jury

was further instructed not to make use of excluded testimony during the jury charge.  There is no

showing that the trial was infected with unfairness or that clearly-established federal law was

violated.  The Court denies Silva's request for relief on this basis.

> **H.**     **Alleged Violation of Silva's Constitutional Rights Based on Denial of the Motion to Suppress**

Silva asserts that this Court should vacate his conviction because the police officers

violated his constitutional rights when he was stopped and searched.  [ECF No. 1-1 at 66].  The

Appeals Court rejected this claim in its opinion and stated that "there were sufficient articulable

facts to support a reasonable suspicion that criminal activity was occurring."  Silva, 2013 WL

6633943, at *2.

As Silva acknowledges, a habeas court normally will not consider Fourth Amendment

suppression claims.  [ECF No. 1-1 at 66]; Stone v. Powell, 428 U.S. 465, 482 (1976).  "[W]here

the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a

state prisoner may not be granted federal habeas corpus relief on the ground that evidence

obtained in an unconstitutional search or seizure was introduced at his trial."  Stone, 428 U.S. at

494; see also Sanna v. Dipaolo, 265 F.3d 1, 8 (1st Cir. 2001) ("Stone thus stands for the

proposition that a federal habeas court ordinarily cannot revisit a state court's disposition of a

prisoner's Fourth Amendment claims.").  Under Stone, habeas review of a Fourth Amendment

claim is only permitted "for instances in which a habeas petitioner had no realistic opportunity to

litigate his Fourth Amendment claim fully and fairly in the state system."  Id.; see also Cavitt v.

Saba, 57 F. Supp. 3d 81, 91 (D. Mass. 2014) (stating that under Stone, "even if this Court

believed that the state court had decided the [Fourth Amendment] issue wrongly . . . habeas relief

could not follow.").  The burden is on the petitioner to show that he did not have a realistic

opportunity to fully and fairly litigate his Fourth Amendment claim.  <u>Sanna</u>, 265 F.3d at 8.

Because Silva had a full and fair opportunity to litigate the suppression issue in the state

courts, Silva cannot meet this burden.  He has failed to show any cognizable constitutional

violation relating to the suppression of evidence, and accordingly, this request for relief is also

denied.

## IV.     CONCLUSION

For the foregoing reasons, Silva's Petition for a Writ of Habeas Corpus is hereby

<u>DENIED</u>.  "The district court must issue or deny a certificate of appealability when it enters a

final order adverse to" a habeas petitioner.  Rules Governing Section 2254, Cases, R. 11(a).  The

Court declines to grant a certificate of appealability in this instance to the Petitioner.

**SO ORDERED.**

April 25, 2019                                                       /s/ Allison D. Burroughs
                                                                    ALLISON D. BURROUGHS
                                                                    DISTRICT JUDGE